No. 25-2905

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DERRICK POLK,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CASE NO. 3:21-CR-16-MJH-25
THE HONORABLE MARILYN J. HORAN

### JOINT APPENDIX
### Vol. 1 (Appx1–83)

Amy B. Levenson Jones
LEVENSON LAW FIRM
5831 Forward Ave #1365
Pittsburgh PA 15217
(917) 406-7165

Mark W. Mosier
Eli Nachmany
  *Counsel of Record*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
enachmany@cov.com

*Counsel for Defendant-Appellant Derrick Polk*

# TABLE OF CONTENTS

| Description | Dkt. | Vol. | Appx |
|---|---|---|---|
| Notice of Appeal (filed Sept. 30, 2025) | 2218 | 1 | 1 |
| Memorandum Opinion and Order Denying Motion to Suppress (filed July 3, 2024) | 1690 | 1 | 3 |
| Judgment as to Derrick Polk as to Counts 1 and 3 of the Superseding Indictment (filed Sept. 26, 2025) | 2217 | 1 | 73 |
| Preliminary Order of Criminal Forfeiture Against Derrick Polk (filed Sept. 25, 2025) | 2216 | 1 | 82 |
| District Court Docket Report | — | 2 | 84 |
| Polk Criminal Case Info Sheet (filed Aug. 10, 2021) | 68-75 | 2 | 107 |
| Polk Criminal Case Info Sheet (filed Nov. 9, 2021) | 453-75 | 2 | 109 |
| Motion to Suppress Evidence by Derrick Polk (filed Apr. 17, 2023) | 1266 | 2 | 112 |
| Ex. A - Search Warrant for 9182 W. Olympic Blvd (filed Apr. 17, 2023) | 1266-1 | 2 | 117 |
| Ex. 1 - Indictment of USPV (filed May 26, 2023) | 1300-1 | 2 | 221 |
| Ex. 2 - Search Warrant as to USPV (filed May 26, 2023) | 1300-2 | 2 | 237 |
| Ex. 3 - Seizure Warrant as to USPV (filed May 26, 2023) | 1300-3 | 2 | 355 |
| Ex. 4 - Operation Order Search Plan (filed May 26, 2023) | 1300-4 | 2 | 360 |

| Description | Dkt. | Vol. | Appx |
|---|---|---|---|
| Ex. 5 - Supplemental Instructions on Box Inventory (filed May 26, 2023) | 1300-5 | 2 | 373 |
| Ex. 6 - Domestic Investigations and Operations Guide (filed May 26, 2023) | 1300-6 | 2 | 378 |
| Ex. 7 - Seizure Warrant as to Box 5911 (filed May 26, 2023) | 1300-7 | 3 | 380 |
| Ex. 8 - Search Warrant as to 5025 E. Pacific Coast Hwy (filed May 26, 2023) | 1300-8 | 3 | 421 |
| Ex. 9 - Criminal Judgment for *United States v. USPV* (filed May 26, 2023) | 1300-9 | 3 | 508 |
| Ex. 10 - Judgment, *Snitko v. United States* (filed May 26, 2023) | 1300-10 | 3 | 513 |
| Ex. 1 - Second Amended Information, *People v. Polk* (filed June 13, 2023) | 1314-1 | 3 | 529 |
| Transcript of Suppression Hearing held on July 14, 2023 (filed July 24, 2023) | 1338 | 3 | 534 |
| Ex. 1 - Search Warrant as to Derrick Polk (filed Aug. 30, 2023) | 1367-1 | 3 | 560 |
| Supplement to Motion to Suppress Evidence by Derrick Polk (filed Dec. 20, 2023) | 1457 | 3 | 633 |
| Plea Agreement as to Derrick Polk (filed June 4, 2025) | 2105 | 3 | 636 |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

    v.

DERRICK POLK

Criminal No. 3:21-CR-16

<u>NOTICE OF APPEAL</u>

Notice is hereby given that Defendant Derrick Polk appeals to the United States Court of Appeals for the Third Circuit from this Court's denial of Defendant's Motion to Suppress Evidence (Dkt. No. 1690) and, accordingly, this Court's judgment of sentencing and preliminary forfeiture (Dkt. No. 2217) in this action.

Dated: September 30, 2025

Respectfully submitted,

By: _____
Stanton D. Levenson, Esq.
PA ID 00765
(412) 889-7270
stan@seriousdefense.com

By: _____
Amy B. Levenson Jones, Esq.
PA ID 80204
(917) 406-7165
amy@seriousdefense.com

*Counsel for the Defendant*

1

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Notice of Appeal has been served through the electronic filing system this 30th day of September, 2025, upon the following:

Maureen Sheehan-Balchan, Esq.
Maureen.Sheehan-Balchon@usdoj.gov

Jill L. Locnikar, Esq.
jill.locnikar@usdoj.gov

Dated: September 30, 2025                    Respectfully submitted,

By: _____
Stanton D. Levenson, Esq.
PA ID 00765
(412) 889-7270
stan@seriousdefense.com

By: _____
Amy B. Levenson Jones, Esq.
PA ID 80204
(917) 406-7165
amy@seriousdefense.com

*Counsel for the Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Case No. 3:21-cr-16** |
| | ) | |
| **v.** | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **DERRICK POLK,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction

Pending before the Court is Defendant Derrick Polk's ("Mr. Polk") Motion to Suppress Evidence. (ECF No. 1266). Mr. Polk's Motion has been fully briefed, (ECF Nos. 1266, 1300, 1314, 1365, 1367, 1378, 1457, 1496), and is ripe for disposition. The Court has jurisdiction over this matter pursuant to 18 U.S.C. Section 3231.

This matter arises from a Federal Grand Jury Superseding Indictment, filed on November 9, 2021, charging Mr. Polk with two offenses. (ECF No. 453). Specifically, at Count One ("Count I"), the Grand Jury charged Mr. Polk and thirty-one alleged co-conspirators with conspiracy to distribute and possess with intent to distribute 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, 280 grams or more of a mixture and substance containing a detectable amount of cocaine base (in the form commonly known as crack), 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, 50 grams or more of methamphetamine, and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, contrary to the provisions of Title 21, United States

Appx3

Code, Sections 841(a)(1), 841(b)(1)(A)(i), 841(b)(1)(A)(ii), 841(b)(1)(A)(iii), 841(b)(1)(A)(vi), and 841(b)(1)(A)(viii), and in violation of Title 21, United States Code, Section 846. (*Id.* at 2–3; ECF No. 454 at 1). At Count Three ("Count III"), the Grand Jury charged Mr. Polk and four other defendants with distribution and possession with intent to distribute 50 grams or more of methamphetamine and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii). (ECF No. 453 at 5; ECF No. 454 at 1).

On April 17, 2023, Mr. Polk filed his Motion to Suppress Evidence, as well as an Exhibit. (ECF No. 1266). In his Motion, Mr. Polk states that, as of March 2021, he was renting a safe deposit box at U.S. Private Vaults ("USPV"), which was located in Beverly Hills, California. (*Id.* at 1–2). According to Mr. Polk, on March 22, 2021, law enforcement officers, who possessed a warrant authorizing the seizure of USPV's property, opened his personal box, "inventoried its contents, and seized those contents[,]" which included $399,000.00. (*Id.*). Mr. Polk indicates that law enforcement then used the contents of his safe deposit box to obtain an additional warrant and search his home. (*Id.* at 2). He also states that agents searched his hotel room and seized his phone. (*Id.*). Mr. Polk argues that the search of his safe deposit box and the seizure of the items contained therein violated the Fourth Amendment because law enforcement's actions were neither supported by probable cause nor an exception to the warrant requirement, namely the inventory search exception. (*Id.* at 2–3). Accordingly, Mr. Polk requests that the Court suppress the evidence obtained from his safe deposit box, as well as any other evidence that law enforcement came to possess as a result of searching the contents of his box at USPV. (*Id.* at 4–5).

Appx4

On May 26, 2023, the Government filed its Response to Mr. Polk's Motion, as well as ten Exhibits. (ECF No. 1300). In its Response, the Government states that USPV, which is located at 9182 W. Olympic Boulevard, Beverly Hills, California, was charged with the following three offenses by a Federal Grand Jury: (1) conspiracy to launder money, (2) conspiracy to distribute controlled substances, and (3) conspiracy to structure financial transactions. (*Id.* at 3). According to the Government, after USPV was indicted, U.S. Magistrate Judge Steven Kim ("Magistrate Judge Kim"), sitting in the Central District of California, authorized the seizure of USPV's business equipment, "including USPV's business computers, money counters, nests of safety deposit boxes, digital and video surveillance and security equipment and biometric scanners." (*Id.* at 4). Magistrate Judge Kim explained that the Warrants he was issuing did not "authorize a criminal search or seizure of the contents of the safe deposit boxes," but he did provide that, in seizing the nests of safe deposit boxes "agents [were to] follow their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents [were to] inspect the contents of the boxes in an effort to identify their owners …" (ECF No. 1300-3 at 3).

The Government avers that, pursuant to these warrants, the Federal Bureau of Investigation (the "FBI") issued two sets of instructions to the agents who would be executing the Search Warrant and the Seizure Warrant at USPV. (ECF No. 1300 at 5). The Government asserts that those agents "executed the inventories properly and within the stated procedures." (*Id.* at 11). Therefore, the Government argues that "the Court need not engage in [a standard inventory

search analysis] since the searches and seizures at issue were lawful and authorized by warrants."
(*Id.*).

On June 13, 2023, Mr. Polk filed a Reply to the Government's Response, as well as an Exhibit. (ECF No. 1314). The parties then submitted additional briefing over the coming months. (ECF Nos. 1365, 1367, 1378, 1457, 1496).

Finally, the Court held a Suppression Hearing on July 14, 2023. (ECF No. 1338). During that Hearing, Mr. Polk clarified that "all of the factual information that [he] was seeking to establish was already in" Exhibits that the Government had referenced, and that there was therefore "no necessity to call the witnesses to simply repeat that." (*Id.* at 6:16–23). Accordingly, on August 28, 2023, the parties submitted a "Joint Motion to Supplement Record by Stipulation[,]" in which they requested that the Court supplement the record in this matter to include: (1) the Exhibit that Mr. Polk submitted along with his Motion at ECF No. 1266, (2) the ten Exhibits that the Government submitted along with its Response at ECF No. 1300, and (3) the Exhibit that Mr. Polk submitted along with his Reply at ECF No. 1314. (ECF No. 1365). On August 30, 2023, the Court entered an Order granting the parties' Joint Motion. (ECF No. 1368).

In light of the foregoing, the following documents are part of the record in this matter:

1. A copy of the Search Warrant for 9182 W. Olympic Boulevard, Beverly Hills, California, filed at Magistrate No. 2:21-mj-1302, in the Central District of California, submitted by Mr. Polk. (ECF No. 1266-1).

2. A copy of the Indictment for USPV, filed at Criminal No. 2:21-cr-106, in the Central District of California. (ECF No. 1300-1).

3.     A copy of the Search Warrant for 9182 W. Olympic Boulevard, Beverly Hills, California, filed at Magistrate No. 2:21-mj-1302, in the Central District of California, submitted by the Government. (ECF No. 1300-2).

4.     A copy of the Seizure Warrant for certain business equipment located at USPV, filed at Magistrate No. 2:21-mj-1307, in the Central District of California (ECF No. 1300-3).

5.     A copy of the FBI operation order and search plan for executing warrants at USPV. (ECF No. 1300-4).

6.     A copy of the supplemental instructions for executing warrants at USPV. (ECF No. 1300-5).

7.     A copy of the FBI policy regarding inventory searches issued by the FBI Domestic Operations Guide. (ECF No. 1300-6).

8.     A copy of the search warrant for USPV Safety Deposit Box 5911 and its contents, filed at Magistrate No. 2:21-mj-1749, in the Central District of California (ECF No. 1300-7).

9.     A copy of the search warrant for 5025 E. Pacific Coast Highway, #P307, Long Beach, California, filed at Magistrate No. 2:21-mj-3194, in the central District of California. (ECF No. 1300-8).

10.    A copy of the criminal judgment for the United States v. USPV, filed at Criminal No. 2:21-cr-106, in the Central District of California. (ECF No. 1300-9).

11.    A copy of the judgment for Paul Snitko, et al. v. United States, filed at Civil No. 2:21-cv-4405, in the Central District of California. (ECF No. 1300-10).

12.    A copy of the Second Amended Information for the People of the State of California vs. Derrick Polk, filed at Case No. BA465575, in the Superior Court of the State of California, for the County of Los Angeles. (ECF No. 1314-1).

13.    A copy of the Search Warrant for Mr. Polk's person, which was issued on July 7, 2021. (ECF No. 1367-1).[1]

For the reasons below, and having considered all record evidence in this matter, the Court finds that the FBI complied with the valid Warrants issued by Magistrate Judge Kim in inventorying the contents of Mr. Polk's safe deposit box at USPV. Based on that holding, the Court proceeds with the understanding that the Government's subsequent actions relative to Mr. Polk and his property were appropriate. Therefore, the Court finds that the Government complied with the Fourth Amendment to the United States Constitution in obtaining the evidence that it now seeks to use against Mr. Polk, a conclusion that leads the Court to **DENY** Mr. Polk's Motion to Suppress Evidence (ECF No. 1266).

---

[1] Although the parties did not expressly stipulate to this document being part of the record in this matter, Mr. Polk seeks the suppression of evidence obtained during a search of his hotel room conducted in July 2021. (ECF No. 1266 at 2). The Government responds by contending that Mr. Polk's argument on this score is "vague and unsubstantiated" and by offering the Search Warrant for Mr. Polk's person. (ECF No. 1367 at 2). Therefore, insofar as that Warrant is relevant to Mr. Polk's argument, and because Mr. Polk has not objected to the Court considering it, (ECF Nos. 1378, 1457), the Court will deem it part of the record in this matter.

## II. Factual Background[2]

The Court begins by overviewing the factual background of this case, which the Court derives from the briefs and exhibits that the parties have submitted to the Court for its consideration.

### A.    The Indictment of USPV

1. In January 2020, a Federal Grand Jury sitting in the Central District of California returned a three-count Indictment against USPV. (ECF No. 1300-1).

2. At Count One of the Indictment ("Count I"), the Grand Jury charged USPV with conspiring to launder money by "knowingly conduct[ing] and attempt[ing] to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, with the intent to promote the carrying on of that specified unlawful activity," in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), among other things. (*Id.* at 2–3).

3. In terms of the Manner and Means of the Conspiracy at Count I, the Grand Jury found that USPV would "adopt business practices that attracted customers in possession of proceeds from criminal offenses, including drug trafficking, and not law-abiding persons." (*Id.* at 3). Such practices often related to the safe deposit boxes that USPV rented. (*Id.* at 3–4). For example, USPV "tout[ed] the anonymity of the safety deposit boxes" that they provided, made "arrangements for the payment of the rental fees in

---

[2] "For purposes of a motion to suppress, the court 'may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.'" *United States v. Brooks*, 358 F. Supp.  440, 447 n.2 (W.D. Pa. 2018) (quoting *United States v. Raddatz*, 447 U.S. 667, 679 (1980)).

cash and other ways that would be untraceable[,]" and issued "safety deposit box keys that were unmarked and unnumbered so that law enforcement could not determine that the keys unlocked safety deposit boxes at USPV[.]" (*Id.*).

4. Further, the Grand Jury found that an Officer of USPV and the Manager of USPV "would negotiate drug deals illegal under California law within the secured space of USPV," and the Officer of USPV would then "store the cash proceeds from drug deals within a safety deposit box at USPV." (*Id.* at 1–5).

5. With respect to the forfeiture allegation at Count I, the Grand Jury found that the "nests of safety deposit boxes and keys" were forfeitable to the United States because they were "involved in or traceable to any transaction set forth in Count [I] of [the] Indictment[.]" (*Id.* at 11).

6. At Count Two of the Indictment ("Count II"), the Grand Jury charged USPV with conspiring "with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D)." (*Id.* at 6).

7. With respect to the forfeiture allegation at Count II, the Grand Jury found that the "nests of safety deposit boxes and keys" were forfeitable to the United States given their connection to the offense at that Count. (*Id.* at 13–14).

8. Finally, at Count Three of the Indictment ("Count III"), the Grand Jury charged USPV with conspiring "with others known and unknown to the Grand Jury to knowingly

and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the Regulations promulgated thereunder:" (1) "cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and" (2) "structure, assist in structuring, and attempt to structure and assist in structing, transactions with one or more nonfinancial trades or businesses, in violation of Title 18, United States Code, Section 5324(b)(3)." (*Id.* at 8).

9. With respect to the forfeiture allegation at Count III, the Grand Jury found that the "nests of safety deposit boxes and keys" at USPV were subject to forfeiture to the United States because they were "involved in or traceable to the offense set forth in Count [III] of [the] Indictment[.]" (*Id.* at 15).

**B.     The Warrants Authorized by Magistrate Judge Kim**

10. On March 17, 2021, Magistrate Judge Kim authorized two warrants relative to USPV — a warrant to search USPV (the "Search Warrant") and a warrant to seize business property of USPV (the "Seizure Warrant"). (ECF Nos. 1300-2, 1300-3). Both Warrants were accompanied by and incorporated by reference the same affidavit submitted by Special Agent Lynne Zellhart of the FBI ("Agent Zellhart"). (ECF No. 1300 at 4 n.5; ECF No. 1300-2 at 1; ECF No. 1300-3 at 4).[3]

---

[3] The Court notes that, in the Exhibits that the Government submitted containing the Search and Seizure Warrants, the Government only attached Agent Zellhart's affidavit to the Search Warrant. (ECF No. 1300-2; ECF No. 1300-3). However, because: (1) the Seizure Warrant incorporates by reference the "*attached* affidavit" of Agent Zellhart, (ECF No. 1300-3 at 4) (emphasis added); (2) the Government avers that the

1.  **The Search Warrant for USPV**

11. On the first page of the Search Warrant, Magistrate Judge Kim found that there was probable cause to search USPV. (ECF No. 1300-2 at 1). That finding was based on any "recorded testimony" submitted to him, as well as the affidavit of probable cause submitted by Agent Zellhart. (*Id.* at 1, 15).

12. Also on the first page of the Search Warrant, Magistrate Judge Kim stated that Agent Zellhart's "affidavit … [was] incorporated herein by reference[.]" (*Id.* at 1). That affidavit accompanies the Search Warrant that the parties jointly submitted to the Court. (*See* ECF No. 1300-2).

13. Magistrate Judge Kim further indicated that certain items at USPV, including the nests of safe deposit boxes and keys, were to be seized as "evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371, 1343, and 1956; 21 U.S.C. §§ 841, 846; and 31 U.S.C. §§ 5324 and 5331 (money laundering, distribution of controlled substances, wire fraud, structuring, and conspiracy to commit the same)[.]" (*Id.* at 5–6).

14. Finally, Magistrate Judge Kim provided that the Search Warrant did "not authorize a criminal search or seizure of the contents of the safety deposit boxes." (*Id.* at 6–7). However, Magistrate Judge Kim also directed that, when the agents seized the nests

---

affidavit of Agent Zellhart that accompanies the Search Warrant is identical to the affidavit that was attached to the Seizure Warrant, (ECF No. 1300 at 4 n.5); and (3) Mr. Polk does not dispute these assertions, (ECF Nos. 1266, 1314, 1338, 1378, 1457), the Court accepts these averments as true. Therefore, the Court finds that the same affidavit of Agent Zellhart, the affidavit that the Court references in the text throughout this subsection, accompanied and was incorporated by reference within both the Search Warrant issued by Magistrate Judge Kim and the Seizure Warrant issued by Magistrate Judge Kim.

of the safe deposit boxes, they were to follow "their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents [were to] inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they [could] claim their property[.]" (*Id.* at 7).

**2. The Seizure Warrant for USPV**

15. On March 17, 2021, Magistrate Judge Kim signed a Seizure Warrant for business equipment of USPV. (ECF No. 1300-3 at 1). In doing so, Magistrate Judge Kim stated that, based on Agent Zellhart's affidavit and any "recorded testimony", he was satisfied that probable cause existed to "believe that the property" described in the Seizure Warrant was in fact "subject to seizure and that grounds exist[ed] for the issuance of this [S]eizure [W]arrant." (*Id.*).

16. In issuing the Seizure Warrant, Magistrate Judge Kim authorized the seizure of the "[n]ests of safety deposit boxes and keys" at USPV. (*Id.* at 3). With respect to the seizure of those items, he wrote that the "[W]arrant [did] not authorize a criminal search or seizure of the contents of the safety deposit boxes." (*Id.*). However, in "seizing the nests of safety deposit boxes," he directed agents to "follow their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents [were to] inspect the contents of the boxes in an effort to identify" the owners of the boxes so that they could claim their property. (*Id.*).

17. Finally, on the face of the Application, Magistrate Judge Kim indicated that Agent

Zellhart's "attached affidavit … [was] incorporated herein by reference." (*Id.* at 4).

18. In her affidavit, Agent Zellhart wrote the following with respect to the nests of safe

deposit boxes and the contents of the safe deposit boxes themselves:

> The search and seizure warrants the government seeks list the nests of safety
> deposit boxes at USPV among the items to be seized. These nests of safety
> deposit boxes are evidence and instrumentalities of USPV's criminality. The
> warrants authorize the seizure of the nests of the boxes themselves, <u>not</u> their
> contents. By seizing the nests of safety deposit boxes, the government will
> necessarily end up with custody of what is inside those boxes initially. Agents
> will follow their written inventory policies to protect their agencies from
> claims of theft or damage to the contents of the boxes, and to ensure that no
> hazardous items are unknowingly stored in a dangerous manner. Agents will
> attempt to notify the lawful owners of the property stored in the boxes on how
> to claim their property, such as by posting that information on the internet or
> at USPV itself, or by contacting the owners directly. In order to notify the
> owners directly, agents will, in accordance with their policies regarding an
> unknown person's property, look for contact information or something which
> identifies the owner.[40] (USPV recommends that box renters include their or
> their designees' telephone numbers on a note in the box in the event that USPV
> removes the contents for nonpayment of rental fees.)

(ECF No. 1300-2 at 111–112) (emphasis in original).

19. In a footnote placed at the end of the sentence concluding with "or something which

identifies the owner[,]" Agent Zellhart affirmed that "FBI policy regarding taking

custody of an unknown person's property provides, in part, that agents 'inspect the

property as necessary to identify the owner and preserve the property for

safekeeping.' The inspection 'should extend no further than necessary to determine

ownership.'" (*Id.* at 112 n.40).

**C.     FBI Policies That Are Relevant to the Search at USPV and Seizure of Its Business
Property**

20. There are three FBI policies that the parties have submitted to the Court and that are

particularly relevant to the inventory search of Mr. Polk's Box at USPV: (1) a portion of the FBI's Domestic Investigations and Operations Guide (the "DIOG") pertaining to *Inventory Searches Generally*", (the "FBI Policy on Inventory Searches"), (ECF No. 1300-6), (2) the "Operation Order Search Plan", (the "OOSP"), (ECF No. 1300-4), and (3) the "Supplemental Instructions on Box Inventory" (the "Supplemental Instructions"). (ECF No. 1300-5). The Court will overview the contents of those three policies in turn.

### 1. The FBI Policy on Inventory Searches

21. Because the FBI Policy on Inventory Searches is fairly brief and highly relevant to the disposition of Mr. Polk's Motion, the Court sets it forth in large part in the paragraphs below. The FBI Policy on Inventory Searches provides as follows:

22. "The purpose of an inventory search is to 1) protect the owner's property while it is in FBI custody; 2) protect the FBI against claims of lost or stolen property; or 3) protect FBI personnel from potential danger. As a threshold matter, in order for an inventory search to be valid, agents must first have lawful custody of the property. The justification for an inventory search is the production of an inventory of the property." (ECF No. 1300-6 at 1).

23. "As a general rule, after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and their contents. A written summary showing the results of the inventory must be recorded [in the appropriate location].

The written summary must include, but is not limited to, a description of the property and the items secured for safekeeping. Agents must provide receipts for all items retrieved during inventory searches. Agents should also memorialize facts pertinent to other activities undertaken during the inventory process, such as an interview … or a non-inventory-related search conducted and any evidence collected … that are relevant to the investigation." (*Id.* at 1–2).

24. "Where practicable, the inventory search should be conducted by two agents/officers, particularly when dealing with property of significant monetary value (e.g. money, jewelry, electronics, valuables, etc.). All personal property taken into FBI custody should be treated with reasonable care. Nonevidentiary items of significant value should be removed for safekeeping and afforded adequate security. Contraband or evidence found should be immediately seized and preserved in accordance with existing procedures governing the seizure of physical evidence." (*Id.*).

25. "Agents may not perform inventory searches solely for investigative purposes. Whenever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible. Searches conducted pursuant to a warrant are presumptively valid. Obtaining a search warrant eliminates any later argument that the inventory search was conducted solely for investigative purposes and thus unjustified." (*Id.*).

**2. The OOSP**

26. The FBI prepared the OOSP on March 12, 2021. (ECF No. 1300-4 at 1). The OOSP sets

forth the following "Mission" with respect to the search at USPV on March 22, 2021:

"On March 22, 2021, at 6:00 a.m., Special Agents of the FBI, DEA, and USPIS will safely

execute the service of Federal search warrants and seizure warrants in the Los Angeles

area related to the investigation of USPV and its principals for money laundering,

drug trafficking, and fraud. Agents will execute warrants at the residences of each of

the four USPV principals, as well as the business itself. In addition, agents will seize

and inventory the facilities of the business, including the nest[s] of safe deposit boxes,

according to the federal seizure warrant." (*Id.* at 2).

27. The OOSP divided the law enforcement agents executing the warrants into six teams.
(*Id.* at 3).

28. Teams 1–4 were responsible for searching the residences of USPV principals,
beginning at 6:00 a.m. on March 22, 2021. (*Id.*).

29. Team 5 was responsible for executing "a search warrant at USPV at 10:00 a.m. … or as
soon as a cooperating principal can assist agents in entering the business." (*Id.*).
Further, the OOSP provided that Team 5 would "seize evidence itemized in the
warrant regarding the underlying crimes (money laundering, fraud, drug trafficking,
etc.)." (*Id.*).

30. Turning to Team 6, the OOSP directed it to "process and inventory the facilities of
USPV, including the nest[s] of boxes." (*Id.*). The OOSP also directed Team 6 to refer to
the Supplemental Instructions, which the Court discusses in further detail below. (*Id.*).

31. Finally, under a heading entitled "Handling of Evidence[,]" the OOSP directed Team

6 to: "inventory the facilities of USPV in compliance with FBI policies and procedures, and as more specifically set out in [the Supplemental Instructions.] All evidence will be processed as set out in [the Supplemental Instructions], including cash and valuables. Uncounted cash will be transported to Loomis directly from USPV; LAFO SWAT will provide security/force protection coverage for transport." (*Id.* at 4).

### 3. The Supplemental Instructions

32. The FBI prepared the Supplemental Instructions on March 12, 2021. (ECF No. 1300-5 at 1). The Court outlines the relevant portions of those Instructions below.

33. The Supplemental Instructions begin with the following "SUMMARY": "Pursuant to Federal seizure warrant, agents are authorized to seize the facilities of the target business (USPV) and conduct an inventory of the contents therein. This includes, but is not limited to, the nest[s] of boxes within the USPV vault. Agents estimate that there are approximately 1,600 boxes and about two thirds of the boxes are rented. Agents will search and inventory all boxes according to FBI policies and procedures. All inventoried contents will be processed as described in this memo[.]" (*Id.* at 2).

34. Thereafter, and under a heading entitled "GENERAL PROCEDURE", the Supplemental Instructions offer seven specific instructions that are especially relevant to the resolution of Mr. Polk's Motion. (*Id.*).

35. First: "[t]wo (2) teams of three (3) agents will operate inside the vault at one time to methodically open and inventory each box. Two (2) complete Admin teams will also be on site to assist in processing evidence, completing paperwork and keeping logs.

Each box will be treated as a separate 'location' and will have a complete set of paperwork." (*Id.*).

36. Second: "[t]he inventory of each and every box will be video recorded, and the video recording will be maintained by DEA." (*Id.*).

37. Third: "[i]f feasible, teams will remove the front door of the box … including the key mechanism and box number, in one piece. In the alternative, teams will drill or otherwise remove the key hole/key mechanism of each box without destroying it. The key hole/key mechanism must be preserved. It will be placed in separate bag/container and marked with the USPV box number." (*Id.*).

38. Fourth: "[t]eams will remove the box itself, label and seize it, taking care to preserve possible fingerprint evidence. Teams will then proceed to identify the contents of each box, creating an inventory list. Items will be bagged/boxed and labeled. [Enumerated] paperwork will be completed[.]" (*Id.* at 3).

39. Fifth: "[a]gents should also note if the box includes a USPV notification form identifying a contact person for the box. Bag and tag the contact form. Agents cannot search the content of boxes for evidence, but may examine the contents to identify the box owner." (*Id.*).

40. Sixth: "[e]ach inventory will likely include the following:" (1) "USPV box door with lock or lock mechanism"; (2) "[f]orm with emergency contact information"; (3) "[t]he physical box itself"; and (4) "[t]he contents (cash gold, silver, phones, log books, hard drives, etc.)[.]" (*Id.*).

41. Seventh: "[g]eneral [e]vidence will be placed in a temporary storage location; [v]aluables will be placed in [s]ecured [t]emporary storage pending transport to Loomis or Westwood[.]" (*Id.*).

42. Under "SECURE EVIDENCE/TRANSPORT", the Supplemental Instructions provide that "[p]rocessed evidence, including cash and valuables, will be placed in one of the USPV 'privacy rooms,' which is a small separate room the business uses to allow customers to view and access the contents of their boxes." (*Id.*).

43. Under "CASH", the Supplemental Instructions provide:

Agents anticipate USPV boxes to contain a large amount of US Currency. US Currency over $5,000 will be placed in an evidence bag (or bags), uncounted. The bag(s) will be sealed, labeled and witnessed. This process will be video-recorded.

There will be canine units on scene. If a canine unit is available, the cash will be taken (by two agents) to the canine unit, where a dog will be employed. If no canine unit is available, or after canine unit has been employed, cash will be taken to the secure room where it will be stored (under guard) until transported to Loomis.

Search/inventory agents should note the condition of cash and make notes on a separate piece of paper which will be handed to the Admin Team with the other completed paperwork. Agents should note things such as how the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee, chemical, etc.); if there appears to be drug residue present; if a gun is also present; or anything else of note. Anything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team.

Search/inventory agents should also note the presence or absence of instructions affixed to the box regarding contact information or ownership. This information should also be communicated to the Admin team.

As soon as possible, cash will be taken to Loomis, where it will be counted. Loomis will generate appropriate receipts and the money will be wired to the US Marshals Service.

(*Id.* at 4).

-18-

44. Finally, under "NON-CASH VALUABLES[,]" the Supplemental Instructions indicated that non-cash valuables, such as gold, watches, and jewelry, were to be "collected, heat-sealed, labeled, inventoried and transported to Evidence Control at Westwood where they will be stored until claimed or otherwise disposed as determined appropriate." (*Id.* at 5).

**D.    The Inventory of Mr. Polk's Box**

45. As agents executed the Search Warrant and Seizure Warrant on USPV and its property, an "inventory search was conducted on all the boxes at USPV, including BOX 5911." (ECF No. 1300-7 at 11–12).

46. During the inventory search of Box 5911, agents discovered that it contained Mr. Polk's contact information and "almost $400,000 in US currency. The cash was isolated and presented to a drug K9 who alerted to the odors of an illegal drug." (*Id.* at 9). The Agents inventorying Box 5911 completed: (1) an "Evidence Collected Item Log[,]" (2) an "Agent Observations and Notes" form, and (3) a "Receipt for Property" form relative to the contents of that Box. (*Id.* at 37–40). The officer handling the drug K9 that smelled the cash in Mr. Polk's Box signed an affidavit swearing that his dog "alerted to the presence of the odor of illegal drugs emitting from" Box 5911. (*Id.* at 39).

47. Further, on or about "March 22, 2021, while the [S]earch [W]arrant on USPV was being executed, a person later identified as [Mr. Polk] walked up to law enforcement officers guarding the perimeter of the search operation [and] provided officers his name, identification card, [and] contact information." (*Id.* at 12).

48. On April 6, 2021, United States Postal Inspector Lyndon A. Versoza ("Inspector Versoza") called Mr. Polk and asked him for his box number. (*Id.* at 6, 12). Mr. Polk "stated that it was 5711. [Inspector Versoza] asked him if he was sure, and [he] responded that he might be off by one, and suggested 5712." (*Id.* at 12).

49. In reality, video from the inventorying of the boxes indicated that another individual owned Box 5711, and the contact information on Box 5911 indicated that it was Mr. Polk's box. (*Id.* at 12–13). Box 5911 was located on the same row as Box 5711. (*Id.*).

50. Finally, during another conversation between Inspector Versoza and Mr. Polk, Inspector Versoza asked Mr. Polk what was in his box, and Mr. Polk responded "'cash.' [Officer Versoza then] asked how much to which [Mr. Polk] told [Officer Versoza] to count it." (*Id.* at 13).

**E.      The Warrant for Mr. Polk's Box (Box 5911)**

51. On April 13, 2021, United States Magistrate Judge Jacqueline Chooljian ("Magistrate Judge Chooljian") issued a Search Warrant for Box 5911 that authorized the seizure of certain items contained therein. (ECF No. 1300-7 at 1–5).

52. The Warrant indicated that the items to be seized were "evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1956 (Money Laundering) and 21 U.S.C. §§ 841, 846 (drug trafficking)[.]" (*Id.* at 5).

53. Specifically, the Warrant authorized the seizure of: (1) "[e]vidence of wealth, such as cash over $5,000, financial instruments, cryptocurrencies, and documents and records referring or relating to the same; and" (2) records "or items containing indicia of

ownership or control of BOX 5911 or its contents such as rental agreements or references to specific persons or their contact information." (*Id.*).

54. In the affidavit of probable cause, which accompanied the Warrant and was incorporated into it by reference, (*id.* at 1), Inspector Versoza swore to the statements in the subsection above, *see supra* Section II.D, regarding the inventory search of Mr. Polk's Box, the results of that search, and the circumstances surrounding the search.

55. In support of the application for the Search Warrant, Inspector Versoza also offered personal training and experience, including a 16-year career as a Postal Inspector as of the time of the application for the Warrant and being "one of seven Postal Inspectors in the US currently designated by USPIS as a Subject Matter Expert ("SME")". (*Id.* at 6).

56. Further, Inspector Versoza outlined several pieces of evidence in support of the request for the Search Warrant, including the following.

57. First, Inspector Versoza enumerated Mr. Polk's extensive criminal history, which includes, but is not limited to: (1) being a registered sex offender, (2) several counts of aggravated sexual assault, and (3) "many felony drug possession convictions." (*Id.* at 9–10).

58. Second, Inspector Versoza noted the fact that, although Mr. Polk's then-current "probation records indicate[d] he [was] transient[,]" his "[f]inancial records … show[ed] that as recently as November 2020, [he had] spent large amounts of unexplained cash." (*Id.* at 10).

-21-

59. Third, Inspector Versoza offered the following sworn statements regarding USPV:

> It is owned and managed by criminals who engage in money laundering, drug trafficking, and structuring, among other offenses. Its business model is designed to appeal to criminals for customers. It charges many times what banks do for similar safety deposit box rentals, but staff conduct countersurveillance for customers, alert them to law enforcement investigations, and structure transactions for them to avoid filing currency reports—in addition to providing them a place to store criminal proceeds anonymously. USPV also launders for its customers cash that is purported to be drug proceeds by converting it into precious metals or wire transfers. The great majority of USPV customers pay cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own bank account, which it uses to pay its operating expenses. By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engages in money laundering.

> (*Id.* at 10–11).

60. When Agents executed the Search Warrant on Mr. Polk's Box, they seized $399,000.

(ECF No. 1266 at 2; ECF No. 1300 at 6; ECF No. 1300-8 at 28).

**F.      The Search Warrant for Mr. Polk's Residence**

61. In July 2021, the Government sought a warrant authorizing the search of Mr. Polk's residence and the seizure of certain contents located therein. (ECF No. 1300-8).

62. Inspector Versoza submitted an affidavit in support of the application for the Search and Seizure Warrant. (*Id.* at 13).

63. In the affidavit, Inspector Versoza offered the same personal training and experience that was offered relative to the warrant for the search of Mr. Polk's Box at USPV. (*Id.* at 24).

64. Further, Inspector Versoza swore that, when Mr. Polk's box at USPV was searched pursuant to the warrant issued by Magistrate Judge Chooljian, $399,000 in cash was

found inside. (*Id.* at 28). And when the cash was "placed in front of a certified drug K9[,]" the dog "alerted to odors of drugs." (*Id.*).

65. Lastly, Inspector Versoza averred learning that "a separate drug trafficking investigation was being conducted out of the Western District of Pennsylvania ("WDPA")" that involved Mr. Polk. (*Id.* at 29). Indeed, Inspector Versoza stated that, beginning on "May 10, 2021, as part of a larger drug trafficking conspiracy investigation, the WDPA investigators initiated a Title III phone intercept on their targets to include" Mr. Polk's telephone. (*Id.*). From these intercepts, "FBI and HSI investigators in WDPA" discovered that Mr. Polk "is a drug supplier who supplies drugs to and receives cash from local WDPA targets through the use of the US Mails." (*Id.*).

66. On July 7, 2021, United States Magistrate Judge John E. McDermott ("Magistrate Judge McDermott") issued a Warrant for the search of Mr. Polk's residence at 5025 E. Pacific Coast Highway, #P307, Long Beach, California, 90804 and the seizure of certain items therein. (*Id.* at 1–12).

67. Specifically, Magistrate Judge McDermott authorized the seizure of items constituting "evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud) and 1956 (money laundering) and 21 U.S.C. §§ 841 and 846 (drug trafficking) (the "Target Offenses")," including "[c]ontrolled substances[,]" "[f]irearms and related items[,]" "[d]ocuments and records referring or relating to law enforcement or bank investigations, accounts being frozen or closed or at risk of the

same, currency transaction reports, and manipulating transactions amounts to avoid scrutiny[,]" and any "digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the TARGET OFFENSES, and forensic copies thereof." (*Id.* at 4–6).

68. Magistrate Judge McDermott also incorporated Inspector Versoza's affidavit into the Warrant by reference. (*Id.* at 1).

69. When agents executed the Warrant on Mr. Polk's residence they seized a handgun, jewelry, and other items. (ECF No. 1266 at 2; ECF No. 1300 at 7).[4]

**G.      The Search and Seizure Warrant for Mr. Polk's Person**

70. On July 7, 2021, Magistrate Judge McDermott issued a Search Warrant for Mr. Polk's person. (ECF No. 1367-1 at 1).

71. Indeed, that Warrant authorized the search of Mr. Polk, a "black male, about six foot tall, weighing about 230 pounds, and born in 1963." (*Id.* at 4).

72. The Warrant further authorized the seizure of "evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud) and 1956 (money laundering) and 21 U.S.C. §§ 841 and 846 (drug trafficking)[,]" including controlled substances, firearms and related items, and any "digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities" of the aforementioned offenses. (*Id.* at 5–7).

---

[4] It is not completely clear to the Court the extent of the additional items that the agents seized from Mr. Polk's residence. However, because the extent of those items is immaterial to the Court's analysis, it need not further concern itself with that issue.

73. Finally, the Warrant incorporated by reference the same affidavit that Inspector Versoza submitted relative to the Search Warrant for Mr. Polk's residence. (*See* ECF No. 1367-1); *see supra* Section II.F.

74. According to Mr. Polk, in searching his hotel room on July 15, 2021, agents seized his phone. (ECF No. 1266 at 2).

### III.   Findings of Fact and Conclusions of Law[5]

The central issue that Mr. Polk raises in his Motion to Suppress is whether it was lawful for the Government to take the actions that it did relative to the contents of his Box at USPV during its search of USPV and its seizure of certain of USPV's business equipment. (ECF No. 1266). Based on his contention that the Government acted unlawfully in searching his Box and learning of its contents, Mr. Polk argues that much of the evidence that the Government later obtained and now seeks to use against him constitutes fruit of the poisonous tree. (*Id.* at 4).

Given the Court's Findings of Fact and Conclusions of Law, the Court holds that it was lawful for the Government to take the actions that it did relative to the contents of Mr. Polk's Box at USPV during its search of USPV and its seizure of certain of USPV's business equipment. In light of that holding, the Court proceeds with the understanding that all of the Government's subsequent actions relative to Mr. Polk and his property were appropriate.

#### A.   The Fourth Amendment Generally

The Fourth Amendment to the United States Constitution provides that:

---

[5] Although the Court titles this section "Findings of Fact and Conclusions of Law", the Court notes that it has found the statements in the previous Section ("Section II") to be established facts as well. In other words, both Section II and this Section ("Section III") contain the Court's Findings of Fact, which the Court uses to reach its Conclusions of Law within this Section.

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. Evidence "obtained through unreasonable searches and seizures must be suppressed as 'fruit of the poisonous tree.'" *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018). However, if a search is conducted pursuant to a valid warrant, the evidence that the Government comes to possess as a result of that search is lawfully obtained. *United States v. Bedford*, 519 F.2d 650, 657 (3d Cir. 1975) ("Since the warrant was validly executed, the search which followed was also valid[.]"); *United States v. Hall*, 505 F.2d 961 (3d Cir. 1974); *see also United States v. Overton*, No. 2:20-CR-120-1, 2024 WL 1973514, at *11 (W.D. Pa. May 3, 2024) ("Generally, for a search or seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based upon probable cause.") (quoting *Bey*, 911 F.3d at 144–45)).

In ruling on a suppression motion, the district court determines the credibility of witnesses, the weight of the evidence, and the deductions and conclusions it will draw from the evidence adduced at the suppression hearing. *United States v. Leveto*, 343 F. Supp. 2d 434, 442 (W.D. Pa. 2004). The defendant initially bears the burden of proof, but once he has established a basis for the suppression motion, the government then shoulders the burden of showing that the search or seizure was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

**B. The Court Finds That the Government Obtained Appropriate Warrants for the Search of USPV and Seizure of Certain of Its Business Equipment and That the Government Properly Discovered and Handled the Contents of Mr. Polk's Box (Box 5911) Pursuant to Those Warrants**

The first and primary issue before the Court is the propriety of the Government's actions relative to Mr. Polk's Box (Box 5911) during its search of USPV and its seizure of certain of its business equipment. In order to address this issue, the Court must answer the following questions: (1) Was there probable cause for Magistrate Judge Kim to issue the Search Warrant and the Seizure Warrant relative to USPV? (2) Did those Warrants properly authorize an inventory search of Mr. Polk's Box, and if they did, what was the scope of that search? (3) Did the Government comply with the Warrants relative to Mr. Polk's Box at USPV? For the following reasons, the Court answers all three questions in the affirmative, and therefore finds that the Government properly learned that Box 5911 belonged to Mr. Polk and contained $399,000.00 in cash manifesting the presence of illegal drugs.

1. **The Court Proceeds With the Understanding That There Was Probable Cause for the Search Warrant and the Seizure Warrant That Magistrate Judge Kim Issued**

Given Mr. Polk's statements in this case, the Court will proceed with the understanding that he is not disputing the fact that there was probable cause for Magistrate Judge Kim to issue the Search Warrant and the Seizure Warrant for USPV and its business property.

It is true that Mr. Polk made the following statement in his initial Motion: "the agents used the warrant [issued by Magistrate Judge Kim], for which they had no probable cause, to rummage through [Mr. Polk's] personal property in the hopes of finding evidence of a crime against an unknown individual." (ECF No. 1266 at 3). At first blush, this statement appears to indicate that Mr. Polk is asserting that there was not probable cause for the issuance of the Warrant(s). However, in a subsequent submission to the Court, Mr. Polk clarified that the "critical issue raised

-27-

by [his] Motion to Suppress is whether the [G]overnment had a lawful basis for the search of his safe deposit box on March 22, 2021, even though the [S]earch [W]arrant … specifically did not authorize the search or seizure of the contents of the boxes." (ECF No. 1314 at 3). In like fashion, during the Suppression Hearing before the Court, counsel for Mr. Polk stated that whether "there [was] probable cause to seek business equipment of USPV" is a "different issue." (ECF No. 1338 at 18:13–14). Instead, the issue currently before the Court is: "[w]as there any probable cause to search [Mr. Polk's] private safety deposit box." (*Id.* at 18:14–16). Therefore, the Court does not understand Mr. Polk to currently dispute the fact that there was probable cause for Magistrate Judge Kim to issue the Warrants for the Search of USPV and the Seizure of its business equipment.[6] Accordingly, the Court proceeds with the understanding that those Warrants were in fact supported by probable cause, and, in the absence of any other challenge to the Warrants by Mr. Polk, the Court proceeds with the understanding that they complied with the Fourth Amendment in their entirety. *United States v. Leveto*, 343 F. Supp. 2d 434, 441–442 (W.D. Pa. 2004).

> **2. The Court Finds That: (1) the Warrants Issued by Magistrate Judge Kim Properly Authorized an Inventory Search of the Boxes at USPV and (2) That Inventory**

---

[6] In like fashion, the Government indicates that Mr. Polk concedes that "the March 22, 2021[,] seizure of USPV property was authorized[.]" (ECF No. 1367 at 1). In relaying this statement, the Court stresses that it is not interpreting Mr. Polk's argument by reference to his adversary's interpretation. Rather, the Court's point is simply that it understands Mr. Polk to argue that, while the Warrants were validly issued, the search of his Box was unlawful because it was neither in step with the Warrants nor supported by probable cause. Insofar as the Government has the same understanding and *therefore does not spend significant time addressing the suggestion that there was not probable cause for the Warrants issued by Magistrate Judge Kim,* the Court finds that it is appropriate to proceed with the understanding that Mr. Polk does not dispute the notion that there was probable cause for those Warrants to issue. In other words, the Court is hesitant to address an argument that neither the Court nor the Government understand Mr. Polk to make. Of course, if Mr. Polk does contend that there was not probable cause for the Warrants to issue, he may make the Court aware of that fact by proper motion in the future.

**Search Was to Be Coextensive with the Inventory Search Exception as Articulated by the United State Supreme Court**

When the Court examines the contents of the Warrants issued by Magistrate Judge Kim, the Court finds that: (1) those warrants properly authorized an inventory search of the Boxes at USPV and (2) Magistrate Judge Kim intended that inventory search to be coextensive with the inventory search exception as articulated by the United States Supreme Court. The Court so finds for the following reasons.

    a.    **Federal Caselaw Indicates That It Was Appropriate for the Warrants in This Case to Authorize an Inventory Search of the Safe Deposit Boxes at USPV**

For the reasons below, the Court finds that there is caselaw supporting the principle that the Warrants issued in this case could permit an inventory search of the safe deposit boxes at USPV.

In *South Dakota v. Opperman*, 428 U.S. 364 (1976), the United States Supreme Court quoted with approval the following language, penned by Judge Wisdom of the United States Court of Appeals for the Fifth Circuit: "'[W]hen the police take custody of *any sort of container* [such as] an automobile … it is reasonable to search the container to itemize the property to be held by the police. [This reflects] the underlying principles that the [F]ourth [A]mendment proscribes only *unreasonable* searches.'" *Id.* at 371 (quoting *United States v. Gravitt*, 484 F.2d 375, 378 (5th Cir. 1973)) (emphasis added).

Taking that rule and applying it in the context of this case, the Court reiterates its findings that: (1) the "nests of safety deposit boxes and keys" at USPV were subject to forfeiture to the United States pursuant to the Federal Grand Jury Indictment of USPV, *see supra* Section II.A, (2)

the valid Warrants issued by Magistrate Judge Kim authorized the seizure of the "[n]ests of safety deposit boxes and keys" at USPV, *see supra* Section II.B, and (3) the Government's lawful possession of the nests of the safe deposit boxes and keys necessitated the Government's possession of the contents of the safe deposit boxes, at least initially. *See supra* Section II.B.1 (according to Agent Zellhart, "[b]y seizing the nests of safety deposit boxes, the [G]overnment will necessarily end up with custody of what is inside those boxes initially."). In other words, in this case, the Government lawfully took custody of the safe deposit boxes (which were containers). Therefore, under *Opperman*, it appears to this Court that it was reasonable for Magistrate Judge Kim to have issued Warrants permitting the Government to inventory the contents of those containers.

Of course, that leaves the Court with the following question—was there something so inherently private about the boxes at USPV that the Supreme Court's statement in *Opperman* is inapplicable in this context? *Snitko v. United States*, 90 F.4th 1250, 1270–71 (9th Cir. 2024) ("Ultimately, given the greater privacy interests at stake and the implication of the rights of third parties, I would hold that the inventory search doctrine does not extend to searches of box contents in a locked vault." (Smith, J., concurring); *see also United States v. Showalter*, 858 F.2d 149, 153 (3d Cir. 1988) ("We know of no authority which creates an inventory exception *to the warrant requirement* which pertains to one's home, rather than an automobile.") (emphasis added). Mr. Polk raises this issue when he states that only customers had keys to the boxes at USPV, (ECF No. 1266 at 1), and when he argues that he had a "good faith expectation in the privacy of his locked

safe deposit box." (ECF No. 1378 at 1). Ultimately, and for the following two reasons, the Court answers this question in the negative.

First, it is true that "[p]eople generally have a reasonable expectation of privacy in a storage unit, because storage units are secure areas that command a high degree of privacy." *United States v. Johnson*, 584 F.3d 995, 1001 (10th Cir. 2009) (internal quotation marks and citation omitted). However, this Court agrees with the United States Court of Appeals for the Second Circuit that:

> [c]ommercial storage units are closer to luggage in an airport, *see United States v. Place*, 462 U.S. 696, 697 (198), or an automobile detained during a traffic stop, *see Illinois v. Caballes*, 543 U.S. 405, 409 (2005), than a dwelling. They do not present the privacy interests associated with the "intimate details" of one's life which are inherently associated with the home.

*United States v. McKenzie*, 13 F.4th 223, 235 (2d Cir. 2021) ("We agree with our sister circuits and district courts in this Circuit that dog sniffs outside of storage units do not violate the renter's reasonable expectation of privacy.") (cleaned up). Indeed, the United States Supreme Court has held that an "expectation of privacy in commercial premises … is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987); *see also Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("But when it comes to the Fourth Amendment, the home is first among equals.").[7]

Second, although the Court need not (and does not) definitively resolve this issue at this time, it does have concerns about affording significant protection to the safe deposit boxes at

---

[7] Therefore, since a *warrantless* inventory search of the contents of a lawfully seized automobile is reasonable under the Fourth Amendment, the Court readily finds that a *warrant* may permit an inventory search of the contents of a safe deposit box lawfully in the Government's custody.

*USPV in particular as of early 2021. California v. Greenwood*, 486 U.S. 35, 39 (1988) (noting that, in

order for a warrantless search and seizure of a place or property to violate the Fourth

Amendment, the individual asserting a violation must "manifest[] a subjective expectation of

privacy in [that place or property] *that society accepts as objectively reasonable*") (emphasis added).

Indeed, the Court reiterates its earlier finding that USPV would "adopt business practices that

attracted customers in possession of proceeds from criminal offenses, including drug trafficking,

and not law-abiding persons." *See supra* Section II.A. The Court also reiterates the fact that USPV

had been under criminal indictment for some time when Magistrate Judge Kim issued the

Warrants in this case. *See supra* Section II.A–B. Accordingly, it is far from clear to the Court that

the privacy interests associated with the boxes at USPV were of the sort that society is prepared

to accept as objectively reasonable.

Therefore, the Court holds that there was nothing about the safe deposit boxes at USPV

that takes this case out of the ambit of the Supreme Court's statement in *Opperman*.

In further support of applying the *Opperman* rule in the context of this case, this Court

notes at least one other court has authorized a *warrant* permitting an inventory search of certain

fixtures *in a home*, even though there was no indication that the fixtures were themselves subject

to seizure.

Indeed, in *U.S. v. U.S. Currency in the Amount of $324,225.00*, 726 F. Supp. 259 (W.D. Mo.

1989), the United States District Court for the Western District of Missouri held that "the

government should be permitted to conduct a limited inventory of a building or house *lawfully*

*seized*. The presence of law enforcement inside the house for this limited purpose is undoubtedly

lawful and proper." *Id.* at 261 (emphasis in original). In expounding upon this finding, the court wrote as follows:

> There is a legitimate concern that law enforcement officers might be tempted to abuse this process and use their seizure powers under 21 U.S.C. § 881 or other laws as a means of circumventing the usual requirement of a showing of probable cause to obtain a search warrant. The court, however, cannot assume that law enforcement officers will attempt to subvert the law. Moreover, there is an added safeguard; in cases like this one, the government must first make a showing of probable cause that the property is subject to forfeiture. Last, the government cannot do more than conduct a[n] inventory search. If the government engages in a search of broader scope than inventorying would allow, the search would probably violate the [F]ourth [A]mendment and any evidence or contraband discovered would be subject to the exclusionary rule. A lawful seizure only legitimizes a limited inventory search of the seized property and not a broad search for evidence of contraband. Whether an "inventory" or a "search" occurred is a factual inquiry to be made based on the facts and circumstances of each case.

*Id.* Therefore, the court issued an Order permitting the United States Marshal to enter the real property at issue and "make an inspection of the property; [and] make an inventory of the defendant real property and fixtures contained therein[.]" *Id.* In doing so, the court rejected the suggestion that the Government had to first agree not to use any contraband or evidence of a crime that it found during the inventory in order to conduct that inventory. *Id.* Finally, the court's decision offered no indication that the fixtures of the home were themselves subject to seizure. *See U.S. Currency in the Amount of $324,225.00*, 726 F. Supp. 259.

In like fashion, in *United States v. Ladson*, 774 F.2d 436 (11th Cir. 1985), the Eleventh Circuit considered "whether the government's lawful seizure of a house in connection with pending civil forfeiture proceedings entitles the government to conduct an inventory search of the house's contents over the objections of a tenant occupying the home." *Id.* at 438. In concluding that it does not, the Eleventh Circuit stressed several facts: (1) the relevant warrant authorized the seizure of

-33-

the real property and the inventory of the real estate and improvements thereon, (2) the relevant warrant did not authorize the government to enter the house without permission, (3) the warrant did not subject the contents of the house to seizure, and (4) "the warrant did not authorize an inventory of property not seized." *Id.* at 438–39. Insofar as the Eleventh Circuit appeared to imply that the warrant *could have* "authorize[d] an inventory of property not seized[,]" i.e., the contents of a home that is subject to seizure, *Ladson* supports this Court's conclusion that the Warrants issued by Magistrate Judge Kim could authorize an inventory search of the contents of the boxes at USPV, boxes housed within nests that were themselves subject to seizure, thereby necessitating the Government's custody of the boxes themselves.

Therefore, for all of the foregoing reasons, the Court holds that it is appropriate to apply the rule from *Opperman* in this case. Indeed, were the Court to find that a judicial officer, such as Magistrate Judge Kim, could not authorize an inventory search of property (such as safe deposit boxes) that the Government comes to necessarily and lawfully possess by virtue of a valid search warrant, the Court would put the Government (and the public) in a precarious position. In the absence of an inventory search in circumstances like these, the Court struggles to see how the Government could: (1) go about returning citizens' property to them (or, relatedly, know that given property belongs to a given individual so as to protect it for safe return to that individual), (2) protect itself against claims of theft, or (3) protect its officers from potentially dangerous subject matter within that property. *Opperman*, 428 U.S. at 371 ("[W]hen the police take custody of *any sort of container* [such as] an automobile … it is reasonable to search the container to itemize the property to be held by the police. [This reflects] the underlying principle that the fourth

amendment proscribes only *unreasonable* searches.") (internal quotation marks and citation omitted) (emphasis added).

Accordingly, for all of the foregoing reasons, the Court finds that the Warrants in this case *could* authorize an inventory search of the boxes at USPV.

> **b.    Magistrate Judge Kim Authorized an Inventory Search of the Boxes at USPV, and That Search Was to be Coextensive With United States Supreme Court Precedent Regarding the Inventory Search Exception**

As the Court noted earlier, in the Warrants that Magistrate Judge Kim issued, he authorized the seizure of the "[n]ests of safety deposit boxes and keys[.]" *See supra* Section II.B. With respect to the seizure of those items, he wrote that the "warrant[s] [did] not authorize a criminal search or seizure of the contents of the safety deposit boxes." *See id.* However, in "seizing the nests of safety deposit boxes," he directed the agents to "follow their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents [were to] inspect the contents of the boxes in an effort to identify" the owners of the boxes. *See id.*

Based on this language, the Court finds that Magistrate Judge Kim issued Warrants relative to USPV that permitted the agents executing those Warrants to inventory the contents of the safe deposit boxes that they found. That leaves the Court with the question of what Magistrate Judge Kim *meant* by granting this authority but also barring the agents from conducting a criminal search or seizure of the contents of the boxes.

To ascertain the meaning behind Magistrate Judge Kim's words, the Court deems it appropriate to examine United States Supreme Court precedent regarding inventory searches. *Cf.*

*Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 700 (2022) ("This Court generally assumes that, when Congress enacts statutes, it is aware of this Court's relevant precedents … [w]hen the words of the Court are used in a later statute governing the same subject matter, it is respectful of Congress and of this Court's own processes to give the words the same meaning in the absence of specific direction to the contrary.") (internal quotation marks and citation omitted).[8]

Supreme Court precedent articulates three bases for inventory searches: "[1] to protect an owner's property while it is in the custody of the police, [2] to insure against claims of lost, stolen, or vandalized property, and [3] to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). Critically, those same three bases are expressly set forth in the Warrants issued by Magistrate Judge Kim. *See supra* Section II.B; ECF No. 1300-3 at 3 ("In seizing the nests of safety deposit boxes, agents shall follow their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners[.]").[9] Therefore, due to: (1) Magistrate

---

[8] Although this language comes in the context of Congressional action, the Court finds that it is appropriate to apply it in this context. Indeed, as with Congress, the Court deems it reasonable to infer that, when a United States Magistrate Judge acts, he is aware of relevant Supreme Court precedent. Likewise, when he uses language from Supreme Court precedent in a later warrant governing the same subject matter as that precedent, it is reasonable to infer that he intended that language to mean the same thing, in the absence of specific direction to the contrary.

[9] The Court notes that Agent Zellhart's affidavit offers further support for the Court's conclusion on this score.

Indeed, a warrant may incorporate an accompanying affidavit by reference, such as through a statement like "attached affidavit which is incorporated herein[.]" *United States v. Tracey*, 597 F.3d 140, 146–48 (3d Cir. 2010) (indicating that the "face sheet of the application and the warrant" are appropriate places for "explicit words of incorporation") (internal quotation marks and citation omitted). Here, Agent Zellhart's affidavit accompanied both Warrants, and in both of those documents, Magistrate Judge Kim stated that Agent Zellhart's "affidavit[] … [was] incorporated herein by reference." *See supra* Section II.B. Therefore, the Court finds that both Warrants appropriately incorporated Agent Zellhart's affidavit by reference.

Judge Kim's choice of words within the Warrant that he issued, (2) Magistrate Judge Kim's presumed familiarity with the inventory search exception articulated by the Supreme Court, and (3) the absence of any language in the Warrant(s) to the contrary, the Court finds that Magistrate Judge Kim's grant of authority to the agents was coextensive with the inventory search doctrine articulated by the Supreme Court.[10]

Relatedly, the manner in which Magistrate Judge Kim restricted the agents' authority is consistent with Supreme Court precedent. Indeed, in *Bertine*, the Supreme Court indicated that evidence seized during an inventory search conducted pursuant to standardized procedures is admissible unless law enforcement officers "acted in bad faith *or for the sole purpose of investigation.*" *Bertine*, 479 U.S. at 372 (emphasis added). In other words, where law enforcement officers conduct a search "solely for the purpose of investigating criminal conduct," the validity

---

Further, the affidavit tracked closely the language of the inventory search exception as articulated by the United States Supreme Court. *See id.* ("The warrants authorize the seizure of the nests of the boxes themselves, not their contents. By seizing the nests of safety deposit boxes, the government will necessarily end up with custody of what is inside those boxes initially. Agents will follow their written inventory policies to [1] protect their agencies from claims of theft or damages to the contents of the boxes, and [2] to ensure that no hazardous items are unknowingly stored in a dangerous manner. [3] Agents will attempt to notify the lawful owners of the property stored in the boxes ...").

In short, the fact that Agent Zellhart's affidavit, which Magistrate Judge Kim expressly incorporated into the Warrants by reference, tracked closely the Supreme Court's language regarding inventory searches further indicates that Magistrate Judge Kim intended the inventory search that he authorized to be coextensive with the inventory search exception as outlined by the Supreme Court.

[10] The Court notes that Magistrate Judge Kim emphasized that part of the purpose for inventorying the boxes at USPV was to identify the owners of the boxes. The Court understands that purpose as generally similar to one of the purposes of an inventory search as articulated by the Supreme Court—protecting an owner's property while it is in the custody of law enforcement. Indeed, if an owner's property is to be protected and potentially returned to a given individual, the Government must first be able to determine that it belongs to that individual. Therefore, moving forward throughout this Memorandum Opinion, the Court treats the purposes of identifying ownership and protecting an owner's property as largely similar.

of the search is dependent upon the "application of the probable-cause and warrant requirements of the Fourth Amendment[,]" not the inventory search exception. *Id.* at 371.

Once again, the Court presumes that Magistrate Judge Kim was familiar with this Supreme Court precedent, and the Court reiterates that the Warrant(s) he issued contain no indication that he intended the language therein to depart from this Supreme Court precedent. Therefore, insofar as Magistrate Judge Kim barred the agents executing the Warrants at USPV from engaging in a "criminal search or seizure of the contents of the safety deposit boxes[,]" *see supra* Section II.B, the Court finds that Magistrate Judge Kim intended to bar the agents from conducting a search "in bad faith *or for the sole purpose of investigation*[.]" *Bertine*, 479 U.S. at 371–72 (emphasis added).

Therefore, the Court holds that the valid Warrants issued by Magistrate Judge Kim permitted the agents executing those Warrants to conduct an inventory search of the safe deposit boxes at USPV, including Box 5911, that was coextensive with the inventory search exception as articulated by the United States Supreme Court.

In reaching this finding, the Court stresses that it appears to be the same finding reached by two other jurists considering this exact legal issue.

Indeed, in *Snitko v. United States*, No. 2:21-CV-04405-RGK-MAR, 2022 WL 20016427 (C.D. Cal. Sept. 29, 2022), the United States District Court for the Central District of California considered claims brought by a class of plaintiffs consisting of "USPV box renters who had their property seized, had identified themselves to the FBI, and had their property returned[,]" and who were alleging "Fourth Amendment violations" arising from the FBI's "search and seizure of

[their] property located in safe deposit boxes on the premises" of USPV. *Id.* at *1. In assessing the merits of the plaintiffs' claims, the court found that, in order to determine "whether the Government's search exceeded the bounds of the warrant [issued by Magistrate Judge Kim], the Court must ascertain whether the Government conducted a constitutionally proper inventory search." *Id.* at *3–6. In other words, it appears that the District Court in *Snitko* implicitly reached the same conclusion that this Court has explicitly reached—Magistrate Judge Kim issued valid Warrant(s) authorizing an inventory search of the boxes at USPV that was coextensive with United States Supreme Court precedent regarding the inventory search exception.

On appeal, the United States Court of Appeals for the Ninth Circuit reversed the District Court's finding that the agents had acted lawfully relative to the contents of the boxes at USPV. *Snitko v. United States*, 90 F.4th 1250 (9th Cir. 2024).[11] In doing so, the Ninth Circuit panel addressed two issues: (1) whether the actions of the agents were valid under the inventory search exception and (2) whether the agents' actions exceeded the scope of the warrant. *Id.* at 1260–65. With respect to the first issue, the Ninth Circuit held that the fact that the "Supplemental Instructions were created specifically for the USPV search takes this case out of the realm of a standardized 'inventory' procedure[,]" meaning that the agents were not acting pursuant to the

---

[11] The Court notes that Mr. Polk provided the Court with this case by way of electronic mail. After Mr. Polk did so, the Government submitted a brief arguing that this "opinion is not part of the record[,] and the Court cannot consider [Mr. Polk's] 'filings' on a shadow docket." (ECF No. 1496 at 3). In responding to this contention by the Government, the Court simply notes that it considers *Snitko* because the Court located the case, which is extremely relevant to the issues currently before it, during its own independent legal research. Therefore, regardless of the propriety of Mr. Polk providing the opinion to the Court by email, the Court deems it appropriate to consider the Ninth Circuit's decision.

inventory search exception. *Id.* at 1262.[12] With respect to the second issue, the Ninth Circuit wrote that the District Court "never analyzed what [the warrant's prohibition on a criminal search or seizure] meant[,]"[13] but did find that the searching agents nonetheless anticipated discovering indicia of criminality. *Id.* at 1263–64. Therefore, the Ninth Circuit found that the District Court had "abused its discretion in holding that the government did not exceed the scope of the warrant's terms." *Id.* at 1264.

In a concurring opinion, Judge VanDyke wrote as follows: "I join the majority's opinion except as to Part II [the part of the opinion examining whether the agents' actions exceeded the scope of the warrant], which I view as unnecessary given the panel's resolution of Part I [the part of the opinion examining whether the agents conducted a valid inventory search]." *Id.* at 1271 (VanDyke, J., concurring). Because Judge VanDyke viewed the questions of whether the agents performed a valid inventory search and whether they exceeded the scope of the warrant as one and the same, he evidently believed that the Seizure Warrant issued by Magistrate Judge Kim authorized an inventory search that was coextensive with the inventory search exception articulated by the United States Supreme Court.

Accordingly, for all of the foregoing reasons, the Court holds that the valid Warrants issued by Magistrate Judge Kim authorized the agents executing those Warrants to conduct

---

[12] For reasons that the Court offers below, *see infra* Section III.B.3.b.i, the Court respectfully disagrees with the Ninth Circuit's conclusion on this score.

[13] The Court has provided its analysis on the meaning of this prohibition in the preceding paragraphs.

inventory searches of the boxes at USPV, including Box 5911, that were coextensive with Supreme Court precedent regarding inventory searches.

### 3. The Government Complied With the Warrants Relative to Box 5911

Thus far, the Court has reached the following findings: (1) (for purposes of this opinion) there was probable cause for Magistrate Judge Kim to issue the Warrants relative to the search of USPV and the seizure of certain of its business equipment and (2) those Warrants properly authorized an inventory search of the safe deposit boxes at USPV, a search that was to be coextensive with Supreme Court precedent. With those findings in place, the Court must now determine whether the Government acted in compliance with the Warrants that Magistrate Judge Kim issued when searching Box 5911.

In order to answer that question, the Court must examine the following: (1) precedent regarding the scope of an inventory search, (2) the policies that the Government enacted in preparation for searching USPV and seizing certain of its business equipment, and (3) the actual search of Box 5911. Because the Court finds that the policies that the Government enacted and the search of Box 5911 that it conducted comport with Supreme Court precedent, the Court finds that the Government properly learned that Box 5911 belonged to Mr. Polk and contained $399,000 in cash manifesting the presence of illegal drugs.

### a. Precedent Regarding the Scope of an Inventory Search

As the Court noted earlier, the Supreme Court has explained that inventory searches "[1] serve to protect an owner's property while it is in the custody of the police, [2] insure against claims of lost, stolen, or vandalized property, and [3] guard the police from danger." *Colorado v.*

*Bertine*, 479 U.S. 367, 372 (1987). Indeed, an "inventory search is a search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items … and to protect against false claims of loss or damage." *Whren v. United States*, 517 U.S. 806, 811 n.1 (1996).

In outlining Supreme Court precedent regarding inventory searches, the Third Circuit has stated that:

> Lawful inventory searches must be conducted according to standardized criteria or established routine, consistent with the purpose of a non-investigative search. This requirement tends to ensure that the intrusion will be limited in scope to the extent necessary to carry out the caretaking function. The criteria or routine must limit an officer's discretion in two ways: first, as to *whether* to search … and second, as to the *scope* of an inventory search. These limitations ensure that officers performing these caretaking functions are not allowed so much latitude that inventory searches are turned into purposeful and general means of discovering evidence of a crime.

*United States v. Mundy*, 621 F.3d 283, 287–88 (3d Cir. 2010) (cleaned up) (emphasis in original).

The Supreme Court has explained that in "forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Rather, a "police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id.* Thus, while "policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors." *Id.* Indeed, the "allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." *Id.; see*

*id.* at 4–5 ("In the present case, the Supreme Court of Florida found that the Florida Highway Patrol had no policy whatever with respect to the opening of closed containers encountered during an inventory search. We hold that absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment[.]").

Evidence seized during an inventory search conducted pursuant to standardized procedures is admissible unless law enforcement officers acted "in bad faith or for the *sole purpose of an investigation.*" *Bertine*, 479 U.S. at 372 (emphasis added); *Wells*, 495 U.S. at 4 ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence."); *see also United States v. Frank*, 854 F.2d 992, 1001 (3d Cir. 1988) ("The mere fact that an inventory search may have also had an investigatory purpose does not, however, invalidate it."); *Snitko v. United States*, 90 F.4th 1250, 1262 (9th Cir. 2024) ([I]n the case of inventory searches, the mere presence of a criminal investigatory motive or a dual motive—one valid, and one impermissible— does not render an inventory search invalid … If an officer follows a truly 'standardized' policy, it is inevitable that he or she would find evidence of a crime, regardless of whether he or she intends it.") (internal quotation marks and citation omitted).

In short, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." *Bertine*, 479 U.S. at 374.

### b. The Policies That the Government Enacted in Preparation for Searching USPV and Seizing Certain of Its Business Equipment

As the Court explained above, there are three written policies that have bearing on the Government's actions relative to the safe deposit boxes at USPV. The first is the FBI Policy on

Inventory Searches, which is found in the DIOG and sets forth the macro FBI policy on inventory

searches. *See supra* Section II.C.1. The second is the OOSP, which the FBI issued on March 12,

2021, and which outlines the "Mission" with respect to the search at USPV on March 22, 2021. *See*

*supra* Section II.C.2. And the final policy is the Supplemental Instructions, which the FBI also

issued on March 12, 2021. *See supra* Section II.C.3. In that document, the FBI provided as follows:

> Pursuant to Federal seizure warrant, agents are authorized to seize the facilities of
> the target business (USPV) and conduct an inventory of the contents therein. This
> includes, but is not limited to, the nest[s] of boxes within the USPV vault. Agents
> estimate that there are approximately 1,600 boxes and about two thirds of the
> boxes are rented. Agents will search and inventory all boxes according to FBI
> policies and procedures. All inventoried contents will be processed as described
> in this memo[.]

*See id.*

In determining whether these policies comport with the Warrants issued by Magistrate

Judge Kim and therefore the Fourth Amendment to the United States Constitution, the Court

must first ascertain whether the simple fact that the FBI *issued* the Supplemental Instructions for

the search of USPV rendered the Government's actions relative to the boxes unconstitutional.

*Snitko v. United States*, 90 F.4th 1250, 1262 (9th Cir. 2024) ("[I]f an agency is given the discretion to

create customized[] inventory policies, based on the features of each car it impounds and each

person detained, the ensuing search stops looking like an 'inventory' meant to simply protect

property, and looks more like a criminal investigation of that particular car or person, i.e., more

like a 'ruse['] … [O]nce the government begins adding a set of 'customized' instructions to a

'standardized' inventory policy—particularly the type of custom instructions presented by this

case—the entire search stops being conducted pursuant to a 'standardized' policy, *regardless of*

*whether the customized instructions conflict with the standardized ones* … Here, the fact that the Supplemental Instructions were created specifically for the USPV search takes this case out of the realm of a standardized 'inventory' procedure.") (emphasis added).

> ### i. Supreme Court Precedent and Caselaw from the Third and Fourth Circuit Courts of Appeals Leads this Court to Conclude That the Mere Creation of the Supplemental Instructions Did Not Take This Case Out of the Realm of a Standardized Inventory Search

For the reasons below, the Court finds that the simple creation of the Supplemental Instructions does not take this case out of the ambit of the inventory search doctrine.

As the Court noted earlier, the Supreme Court wrote the following regarding inventory searches in *Florida v. Wells*:

> [I]n forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical "all or nothing" fashion. Inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger. A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in the light of the nature of the search and the characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the container's exteriors. The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment.

495 U.S. 1, 4 (1990) (cleaned up). In short, *Wells* stands for the principle that macro inventory search policies may permit officers to exercise a measure of discretion, so long as that discretion is exercised in accordance with the "purposes of an inventory search" and hence the macro inventory policy itself. Given that rule, the Court finds it reasonable to infer that the FBI Policy

-45-

on Inventory Searches (the macro policy in this case) could tolerate the issuance of the Supplemental Instructions (the micro policy in this case), so long as the FBI exercised its discretion in writing the Supplemental Instructions such that they were in accordance with the "purposes of an inventory search" and hence the FBI Policy on Inventory Searches itself. The Court finds that precedent from the Third and Fourth Circuit Courts of Appeals confirms this principle.

In *United States v. Mundy*, 621 F.3d 283 (3d Cir. 2010), the Third Circuit considered an appeal in which a defendant, Eric Mundy ("Mr. Mundy"), argued that the District Court erroneously "admitted evidence that was seized during an inventory search of his car, in violation of the Fourth Amendment." *Id.* at 285. In assessing the merits of Mr. Mundy's appeal, the Third Circuit explained that the "Philadelphia Police Department ha[d] issued guidelines—known as the Live Stop (the "PPD Live Stop Policy")—that implement[ed] the impoundment provisions of the Pennsylvania Vehicle Code[.]" *Id.* at 289. Specifically, in relevant part, the PPD Live Stop Policy provided the following:

> [T]he investigating officer[] shall …
>
> 1. Have the operator and occupants exit the vehicle and remain on location …
>
> 2. Complete the Towing Report by conducting a vehicle inventory describing any damage and/or missing equipment, personal property of value left in the vehicle by the operator/occupants[,] including the trunk area if accessible.
>
> NOTE: No locked areas, including the trunk area, will be forced open while conducting an inventory.

*Id.* at 289 n.4.

In Mr. Mundy's case, after officers stopped his vehicle and discovered that there was no registration information available for it, they placed him in their patrol car and radioed for a tow truck. *Id.* at 285–86. Thereafter:

> [One of the officers] began to search the interior of the vehicle and, using a key [Mr.] Mundy provided, opened the locked trunk. The only items in the trunk were a tool kit and a gray plastic bag containing a closed shoebox. [That officer] removed the shoebox from the plastic lid and proceeded to open it. Inside, he found a brown paper lunch bag and two clear plastic zip-locked bags filled with a substance that appeared to be cocaine. [The officer] opened the paper lunch bag and found four more clear plastic lip-locked bags, also containing a substance that appeared to be cocaine. [The officer] replaced the items, closed the trunk of the vehicle, placed [Mr.] Mundy under arrest, and recovered $1,107 in cash from his person. The officers then notified narcotics agents. They did not complete a Towing Report listing the items found during the search.

*Id.* at 286. After obtaining a search and seizure warrant for Mr. Mundy's vehicle, law enforcement executed that search warrant, finding: (1) six clear plastic bags containing 746.9 grams of cocaine, (2) two plastic jars, (3) a small amount of marijuana, and (4) certain documents. *Id.* After the District Court denied Mr. Mundy's Motion to Suppress that evidence, the jury found him guilty on both counts with which he was charged, and Mr. Mundy appealed to the Third Circuit. *Id.* at 286–87.

On appeal, Mr. Mundy's primary argument regarding the evidence found in the shoebox in the trunk of his vehicle was that "although the Philadelphia Police Department did have a policy on inventory searches, the policy did not address explicitly how closed containers were to

be treated[,]" meaning that the cocaine that law enforcement seized from the shoebox in the trunk of his car was the fruit of an illegal inventory search. *Id.* at 288.

> In responding to this contention, the Third Circuit reasoned as follows:
>
> Inventory searches are not "totally mechanical" procedures. *Wells*, 495 U.S. at 4. Standardized criteria or routine may adequately regulate the opening of closed containers discovered during inventory searches without using the words "closed container" or other equivalent terms. We decline to create a rule of constitutional dimension that requires an inventory search protocol to predict every conceivable scenario an officer may happen upon while conducting an inventory search, and to provide a formulaic directive for each and every one. Such a requirement would not only prove unworkable, but would run contrary to the letter and spirit of *Bertine* and *Wells*.
>
> Instead, "reasonable police regulations relating to inventory procedures," *Bertine*, 479 U.S. at 374, mean that "[t]he policy or practice" is "designed to produce an inventory[,]" *Wells*, 495 U.S. at 4, and that the criteria do not allow officers "so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime." *Id.* Those principles are satisfied here.
>
> The PPD Live Stop Policy explicitly sets out its objectives, namely, to protect the owner's property and shield the officers from claims of loss or damage. The Policy also sufficiently regulates the scope of the search, directing investigating officers to search all accessible areas of the vehicle (including the trunk), provided that they are not forced open, to determine if they contain "any … personal property of value," or other effects. A search of unlocked containers that may hold such property or effects, as happened here, *falls comfortably within the PPD Live Stop Policy's general directive,* and therefore does not violate the Fourth Amendment.

*Mundy*, 621 F.3d at 290–91 (cleaned up) (emphasis added). In short, in *Mundy*, the Third Circuit upheld an inventory search where the officer conducting that search took an action that was not explicitly directed by the relevant macro policy, but that was very much in accordance with the "general directive" of that policy.

Before concluding, the Third Circuit addressed two additional arguments advanced by Mr. Mundy. First, he contended that the "officers' reliance on the PPD Live Stop Policy was a

pretext for an investigatory search because the officers did not complete a Towing Report[.]" *Id.* at 293. In the course of deeming this argument unavailing, the Third Circuit reasoned that, although "compliance with procedures tends to ensure the intrusion is limited to carrying out the government's caretaking function, failure to follow through with standard procedures does not necessarily render the search unreasonable." *Id.* (internal quotation marks and citation omitted). Second, Mr. Mundy argued that the officers "were motived by the expectation of finding criminal evidence in his vehicle." *Id.* at 294. In deeming this argument unavailing, the Third Circuit cited with approval the following language from the Second Circuit Court of Appeals:

> [T]he Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search. When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes.

*Id.* (quoting *United States v. Lopez*, 547 F.3d 364, 372 (2d Cir. 2008)).

For all of the foregoing reasons, the court concluded that the search of the shoebox in Mr. Mundy's trunk did not violate the Fourth Amendment. *Id.*

In like fashion, in *United States v. Banks*, 482 F.3d 733 (4th Cir. 2007), the United States Court of Appeals for the Fourth Circuit considered an appeal by Defendant Gregory Banks ("Mr. Banks"), in which he argued that the "trial court erred in denying his motion to suppress evidence obtained from an inventory search of two duffle bags brought to the police station during a 2000 arrest." *Id.* at 735. At the time of his arrest, Mr. Banks requested that a detective on the scene, Detective Gunn, retrieve two black bags located in the trunk of a Lincoln Town Car. *Id.* at 736.

Detective Gunn retrieved the two bags and took them to the stationhouse. *Id.* Upon arrival, Detective Gunn opened the two bags for the first time and "immediately noticed contraband[.]" *Id.* Over the coming days, Detective Gunn inventoried the contents "of the bags in his office, itemizing the contraband on an investigative report … [and] contacted the [Drug Enforcement Administration (the "DEA")] requesting that the items be collected. After being stored 'for a long time' under [Detective] Gunn's desk … the bags were finally transferred to the DEA." *Id.*

Before his trial, Mr. Banks's counsel moved to suppress the evidence recovered as a result of Detective Gunn's search of the two bags. *Id.* at 738. The District Court denied the motion, "finding [Detective] Gunn's search to be an 'inventory search' and thus allowable without a warrant." *Id.* Mr. Banks was ultimately convicted on all but one count and sentenced to sixteen years of imprisonment. *Id.*

On appeal, Mr. Banks argued that the search of the two bags was unlawful and therefore all evidence obtained subsequent to the search was fruit of the poisonous tree. *Id.* Specifically, Mr. Banks contended that there were six discrepancies between the relevant written policy regarding the "intake steps that should be followed by booking personnel in processing detainees" and the actions of Detective Gunn. *Id.* at 739–40. Based on those six discrepancies, Mr. Banks advanced two arguments: (1) "the discrepancies themselves amount to a constitutional violation" and (2) "the discrepancies revealed that [Detective] Gunn's purpose in conducting an inventory was to gather incriminating evidence." *Id.* at 740.

In deeming Mr. Banks's first argument unavailing, the Fourth Circuit stressed the fact that the case before it presented an "unusual scenario[.]" *Id.* Indeed, the Fourth Circuit framed the

question before it in the following manner: "whether, in light of the unusual circumstances leading to [Detective] Gunn's possession of the two bags at the stationhouse, he acted in accordance with standard procedures more generally." *Id.* In answering this question in the affirmative, the Fourth Circuit reasoned that:

> The written policy reveals that the end result of an inventory search in the typical arrest scenario is that the arrestee's person and possessions are searched, with paper currency returned immediately to the arrestee, other personal property stored until the arrestee's release, and contraband seized and secured. [Detective] Gunn's search of the bags mirrored this routine practice. Just as the bags would have been searched and their contents confiscated and secured by booking personnel in a typical arrestee processing, they were searched, confiscated and secured by [Detective] Gunn.

*Id.* at 740–41. In short, in addressing the six discrepancies between the written policy and Detective Gunn's actions, and in light of the unusual circumstances surrounding his possession of the bags, the Fourth Circuit found that Detective Gunn's actions did not violate the Fourth Amendment because his conduct effectuated what would have occurred had the written policy been followed in full. In other words, the Fourth Circuit's decision indicates that law enforcement may even differ from a macro policy in unusual circumstances (at least in minor ways), so long as their actions generally comport with the goals of that macro policy, and so long as their actions generally lead to the same result that would be produced by following the macro policy.

Finally, with respect to Mr. Banks's argument that Detective Gunn's purpose in conducting the inventory was to gather incriminating evidence, the Fourth Circuit noted that the District Court had found that Detective Gunn's actions were perfectly reasonable and did not indicate bad faith on his part. *Id.* at 741. The Fourth Circuit further noted that Mr. Banks had

-51-

presented "no evidence that [Detective] Gunn initiated the search of the bags or conducted the inventory search because he suspected that he would find incriminating evidence therein." *Id.*

Ultimately, the Fourth Circuit held that, because Detective Gunn "did replicate standard procedures in conducting the search of [Mr.] Banks's bags to the extent possible on these facts, and because the district court's finding that [Detective] Gunn acted in good faith was not clearly erroneous, [Mr.] Banks cannot show that the search of the bags was constitutionally improper." *Id.*

The Court's point in relaying these decisions is this—Supreme Court (and related Circuit Court) precedent indicates that, if there is a constitutionally valid macro policy governing inventory searches, that macro policy may permit micro actions by law enforcement officers that are not explicitly directed by the macro policy, so long as those actions generally comply with the macro policy and thus the purposes of an inventory search. *See Wells*, 495 U.S. 1; *Mundy*, 621 F.3d 283; *Banks*, 482 F.3d 773. By way of example, a macro policy may permit micro decisions about whether to search a closed container, so long as that search comports with the purposes of an inventory search and the general goals of the macro policy. *See Wells*, 495 U.S. 1; *Mundy*, 621 F.3d 283; *Banks*, 482 F.3d 773

In other words, micro actions need not be explicitly directed by and completely identical to a macro policy in order for those micro actions to be constitutional. Were the rule to be otherwise, micro actions would never be permitted, meaning that inventory policies could never permit any discretion on the part of law enforcement, a conclusion that clearly contravenes *Wells*.

Appx54

*Wells*, 495 U.S. at 4 ("The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment.").

Taking that principle and applying it in the context of this case, the Court finds that the simple fact that the FBI promulgated the Supplemental Instructions does not take this case out of the context of the inventory search exception as articulated by the Supreme Court. Indeed, the Court finds that, so long as the FBI Policy on Inventory Searches (the macro policy in this case) comported with the requirements of an inventory search, and so long as the Supplemental Instructions were written in accordance with the "purposes of an inventory search" and hence the FBI Policy on Inventory Searches itself, the Supplemental Instructions are valid, even if they are not completely identical to the FBI Policy on Inventory Searches.

Before continuing, the Court briefly pauses to note that it finds it even *more* reasonable for the FBI to have issued the Supplemental Instructions in this case than it is for an individual law enforcement officer to decide whether to open a closed container in another case. Indeed, on the one hand, the discretion permitted by *Wells*, *Mundy*, and *Banks* permits *individual* officers to make judgment calls in *individual* cases *without written policies explicitly dictating those judgment calls*, so long as their actions complied with the overarching inventory policy. Conversely, the Supplemental Policy here applied to *all* officers searching *hundreds* of safe deposit boxes at USPV and *provided written policies (at least largely) eliminating judgment calls*. *South Dakota v. Opperman*,

428 U.S. 364, 371 (1976) (noting that "the fourth amendment proscribes only *unreasonable* searches.") (internal quotation marks and citation omitted) (emphasis added).

Therefore, for all of the foregoing reasons, the Court holds that the simple fact that the FBI promulgated the Supplemental Instructions relative to the search of USPV does not invalidate the inventory search of Box 5911.

> ### ii. The Macro Policy (the FBI Policy on Inventory Searches) Comports With Supreme Court Precedent on Inventory Searches, and the Micro Policy (the Supplemental Instructions) Likewise Comports With Supreme Court Precedent, as Well as The Macro Policy

The Court now turns to the issue of whether the policies that the FBI utilized in searching Mr. Polk's Box at USPV—the FBI Policy on Inventory Searches, the OOSP, and the Supplemental Instructions, *see supra* Section II.C—are consistent with Supreme Court precedent and thus generally in harmony with each other. In order to answer that question, the Court addresses each policy in turn.

Beginning with the FBI Policy on Inventory Searches, the Court finds, for purposes of this Memorandum Opinion, that it complies with Supreme Court precedent regarding inventory searches. Indeed, the Court notes that Mr. Polk does not assert that the FBI Policy on Inventory Searches is out of step with Supreme Court precedent. (ECF Nos. 1266, 1314, 1338, 1378, 1457). Further, the Court notes that the FBI Policy on Inventory Searches expressly sets forth Supreme Court precedent regarding inventory searches and *appears* to take strides to comport with those principles. *See supra* Section II.C.1. Accordingly, the Court proceeds with the understanding that the FBI Policy on Inventory Searches complies with the inventory search exception as articulated by the Supreme Court and implemented within the Warrants issued by Magistrate Judge Kim.

Turning next to the OOSP, the Court again notes that Mr. Polk does not challenge that document in any respect. (ECF Nos. 1266, 1314, 1338, 1378, 1457). Indeed, the OOSP primarily sets forth the general plan for the Government's operations relative to USPV. *See supra* Section II.C.2. With respect to the boxes at USPV, the OOSP merely directed agents to "inventory the facilities of USPV in compliance with FBI policies and procedures, and as more specifically set out in [the Supplemental Instructions.]" *See id.* Because the OOSP simply referred agents to other policies regarding inventorying the boxes, the OOSP itself is not particularly relevant to Mr. Polk's arguments in this case. Therefore, the Court proceeds with the understanding that it likewise complies with the inventory search exception as articulated by the Supreme Court and implemented within the Warrants issued by Magistrate Judge Kim, and that it comports with the FBI Policy on Inventory Searches.

All of that leads the Court to the Supplemental Instructions. With respect to that document, Mr. Polk does not lodge a specific objection to any particular provision contained therein. (ECF Nos. 1266, 1314, 1338, 1378, 1457). Further, having reviewed the Supplemental Instructions in their entirety and considered them in the context of all of the evidence before the Court, the Court finds that the Supplemental Instructions: (1) comport with the bases for an inventory search as articulated by the Supreme Court, *Colorado v. Bertine*, 479 U.S. 367, 372 (3d Cir. 1987); (2) constitute standardized criteria consistent with the purpose of a non-investigative search, meaning that they limited officers' discretion as to whether to search the boxes at USPV and the scope of that search, *United States v. Mundy*, 621 F.3d 283, 287–88 (3d Cir. 2010); and (3) simply extend the FBI Policy on Inventory Searches (the macro policy) into the context of a large-

scale operation in a manner that is harmonious with that macro policy (and the OOSP). *Florida v. Wells*, 495 U.S. 1, 14 (1990); *Mundy*, 621 F.3d 283; *United States v. Banks*, 482 F.3d 733, 740–41 (4th Cir. 2007).[14]

For the majority of the Supplemental Instructions, the Court's conclusions are self-evident. However, for two particular components of those Instructions—first, having canine units sniff cash found within the safe deposit boxes and, second, placing cash in excess of $5,000 in evidence bags and making notes as to the conditions of that cash—the Court finds it appropriate to further explain its findings.

Turning first to the canine units, the Court makes two notes.

First, one of the central purposes of an inventory search, as articulated by the Supreme Court and Magistrate Judge Kim, is to protect the officers searching the property that they have lawfully seized. *Bertine*, 479 U.S. at 372; *see supra* Section II.B. In this case, the Indictment of USPV provides strong evidence that illegal drugs could be present within at least certain of the safe deposit boxes at USPV, including on cash found therein. *See supra* Section II.A (noting that USPV would adopt "business practices that attracted customers in possession of proceeds from criminal offenses, including drug trafficking," and also explaining that an officer of USPV and the manager of USPV would negotiate drug deals illegal under California law within the secured space of

---

[14] Indeed, the Court notes that the OOSP expressly stated that Team 6 would inventory the "facilities of USPV in compliance with FBI policies and procedures, and as more specifically set out in [the Supplemental Instructions.]" *See supra* Section II.B.2. In like fashion, the Supplemental Instructions provided that "agents [would] search and inventory all boxes according to FBI policies and procedures. *See supra* Section II.B.3. The Court finds that these statements, which indicate that the Government intended for the Supplemental Instructions to simply further expound upon the FBI's policies and procedures (including the FBI Policy on Inventory Searches), further bolsters the Court's conclusion that the Supplemental Instructions were consistent with the FBI Policy on Inventory Searches (and the OOSP).

USPV). Therefore, the Government had a strong, non-investigatory motive in having canine units on scene in an effort to discover the presence of illegal drugs and other substances on the cash within the boxes—namely, *protecting the agents* tasked with handling that currency.

Second, as the Court explained above, even if the Government had a measure of investigatory purpose in having canine units on scene, that fact alone does not invalidate an inventory search under Supreme Court precedent (or the Warrants issued by Magistrate Judge Kim). *Bertine*, 479 U.S. at 372 (indicating that evidence seized during an inventory search conducted pursuant to standardized procedures is admissible unless law enforcement officers acted "in bad faith or for the *sole purpose* of an investigation.") (emphasis added); *see also Snitko v. United States*, 90 F.4th 1250, 1262 (9th Cir. 2024) ("[I]n the case of inventory searches, the mere presence of a criminal investigatory motive or a dual motive—one valid, and one impermissible—does not render an inventory search invalid[.]") (internal quotation marks and citation omitted); *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003) (noting that, in the course of the search that law enforcement conducted, they "called for a drug-sniffing dog to be brought to the scene" but stating that an investigatory motive alone "does not sour an inventory search"); *United States v. Frank*, 854 F.2d 992, 1001 (3d Cir. 1988) ("The mere fact that an inventory search may have also had an investigatory purpose does not, however, invalidate it.").

Therefore, the Court finds that the drug-sniffing canine provision within the Supplemental Instructions does not invalidate those instructions under Supreme Court precedent or the Warrants issued by Magistrate Judge Kim.[15]

---

[15] The Court makes the same finding with respect to the provision for preserving fingerprint evidence. *See supra* Section II.C.3. Such evidence could be used to return the contents of a given box to its rightful owner,

Turning to the provision for placing cash in excess of $5,000 in evidence bags and making notes as to the condition of that cash, the Court makes similar findings as it did regarding the drug-sniffing canines.

Indeed, the Court begins by noting that another portion of the Supplemental Instructions indicated that all non-cash valuables discovered during the inventorying of the boxes at USPV were to be "transported to *Evidence Control* at Westwood where they will be stored *until claimed* or otherwise disposed as determined appropriate." *See supra* Section II.C.3 (emphasis added). Plainly, this provision contemplates housing certain items in "Evidence Control[,]" yet allowing for those items to be claimed by law-abiding citizens, if appropriate. In other words, it is unclear that, by simply placing cash in excess of $5,000 in evidence bags, the Supplemental Instructions contemplated taking any investigatory steps relative to that currency. Rather, such a maneuver could easily be understood (and in fact is understood by this Court) as a way to collect cash from a given box and ensure its safekeeping until its return to its rightful owner, just as non-cash valuables stored in "Evidence Control[.]" Likewise, with respect to taking notes regarding the condition of the cash within any given box, such notes would undoubtedly be helpful in ascertaining the rightful owner of that currency and thus protecting that individual's property,

---

which is one of the reasons why Magistrate Judge Kim directed that the boxes be inventoried, and a measure of investigative motive behind preserving fingerprint evidence does not invalidate the Supplemental Instructions. Further, it is not clear that merely *preserving* fingerprint evidence means that that evidence would ever be used by the Government in the absence of otherwise having probable cause to obtain a search warrant for a given box.

which is one of the reasons why Magistrate Judge Kim directed agents to inventory the boxes. *See supra* Section II.B.[16]

Further, as the Court noted earlier, even if the Government did have a measure of an investigatory motive in its handling of the cash in the boxes, that motive does not invalidate the Supplemental Instructions. *Bertine*, 479 U.S. at 372; *see also Snitko*, 90 F.4th at 1262; *Frank*, 854 F.2d at 1001. That fact is especially true in this case, given the Grand Jury's finding that there was probable cause to believe that USPV would "adopt business practices that attracted customers in possession of proceeds from criminal offenses, including drug trafficking, and not law-abiding persons[,]" and that such practices often related to the safe deposit boxes that USPV rented. *See supra* Section II.A. Indeed, it would run afoul of Supreme Court precedent to require the Government to ignore potential evidence it encountered when conducting a constitutionally-valid inventory search. *Bertine*, 479 U.S. 367 (holding that the Fourth Amendment did not bar the introduction of evidence discovered during a valid inventory search at defendant's criminal trial). And the knowledge (or even the hope) on the part of law enforcement that an inventory search will result in discovering evidence of a crime does not invalidate that search. *Mundy*, 621 F.3d at 294 ("When officers, following standardized inventory procedures, [seize an item] in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized

---

[16] Insofar as the Supplemental Instructions directed agents to note whether the cash had a strong odor or if there appeared to be drug residue present, those directions undoubtedly pertained to the safety of the agents conducting the search.

procedures for legitimate custodial purposes.") (quoting *United States v. Lopez*, 547 F.3d 364, 372 (2d Cir. 2008)).[17]

Therefore, the Court finds that the Supplemental Instructions' provisions for the handling of cash within the safe deposit boxes do not invalidate those Instructions under Supreme Court precedent or the Warrants issued by Magistrate Judge Kim.

Accordingly, the Court reiterates its findings that the Supplemental Instructions: (1) comport with the bases for an inventory search as articulated by the Supreme Court; (2) constitute standardized criteria consistent with the purpose of a non-investigative search, meaning that they limited officers' discretion as to whether to search the boxes at USPV and the scope of that search; and (3) simply extended the FBI Policy on Inventory Searches into the context of a large-scale operation in a manner that is harmonious with that macro policy (and the OOSP).

### c.       The Search of Box 5911

At this juncture, the Court has made the following findings: (1) (for purposes of this opinion) there was probable cause for Magistrate Judge Kim to issue the Warrants relative to the search of USPV and the seizure of certain of its business equipment; (2) those Warrants properly

---

[17] For all of these reasons, the Court also finds that the provision in the Supplemental Instructions directing agents to note "and communicate to the Admin team" anything that "suggest[ed that] the cash may be criminal proceeds" does not place the Government's actions in this case outside of the boundaries of the Fourth Amendment. *See supra* Section II.C.3. Indeed, as the Court explained in the text above, the Government had a valid reason, tethered to the purposes of an inventory search for examining the conditions of the cash within any given box (namely, ascertaining the rightful owner of the cash and therefore protecting that owner's property until it could be returned). Further, Supreme Court precedent permits the Government to take stock of evidence discovered during a lawful inventory search. *Bertine*, 479 U.S. 367 (holding that the Fourth Amendment did not bar the introduction of evidence discovered during a valid inventory search at defendant's criminal trial). Therefore, the Court holds that this provision does not place the Supplemental Instructions in general (or the Government's inventory search of Mr. Polk's Box in particular) outside of the ambit of what is lawful under the Fourth Amendment.

authorized an inventory search of the safe deposit boxes at USPV, a search that was to be coextensive with Supreme Court precedent; and (3) the three policies that the Government utilized relative to the safe deposit boxes at USPV complied with Supreme Court precedent and the Warrants and were thus harmonious with each other. Accordingly, the only remaining issue for the Court is whether the Government's search of Box 5911 complied with those three policies (and therefore Supreme Court precedent and the Warrants issued by Magistrate Judge Kim). For the following reasons, the Court finds that the Government's inventory search of Box 5911 did in fact comply with the three policies, the Warrants, and Supreme Court precedent.

In searching Mr. Polk's Box at USPV, the Government took three actions that are relevant to his Motion—(1) it completed certain forms relative to the contents of Box 5911 and the like,[18] (2) it found $399,000.00 in cash in Box 5911, and (3) it presented that cash to a drug-sniffing dog, which alerted to the odors of an illegal drug. *See supra* Section II.D.

Turning first to the Government finding $399,000.00 in cash, the simple action of opening Mr. Polk's Box and finding the cash therein was plainly in accordance with the policies issued by the FBI. Indeed, the FBI Policy on Inventory Searches directed agents to "conduct a prompt and thorough search of the contents of" property in the agents' custody. *See supra* Section II.C.1. And the Supplemental Instructions directed agents to "inventory all boxes [at USPV] according to FBI policies and procedures[,]" stated that "[a]ll inventoried contents will be processed as described in this memo[,]" and included an express provision for the handling of cash found within the

---

[18] Mr. Polk does not argue that the completion of these forms in any way placed the Government's actions outside of the confines of a lawful inventory search, (ECF Nos. 1266, 1314, 1338, 1378, 1457), and the Court sees no way in which they could have rendered the Government's actions violative of the Fourth Amendment.

boxes. *See supra* Section II.C.3. Relatedly, determining whether a box contained cash was directly tethered to at least two of the bases for an inventory search as articulated by Magistrate Judge Kim—identifying the owner of the box (by giving the Government a means of verifying a claim of ownership) and protecting the Government's agents from an allegation of misplaced or stolen property (by enabling the Government to record exactly how much money was in a given box). *See supra* Section II.B. Therefore, the Court finds that the Government's actions in opening Mr. Polk's Box and finding the cash therein complied with the Supplemental Instructions, and in turn the Warrants issued by Magistrate Judge Kim and Supreme Court precedent.[19]

---

[19] The Court does note that, although the Supplemental Instructions indicated that cash in excess of $5,000 found in the boxes would not initially be counted, *see supra* Section II.C.3, the Government plainly counted the cash in Mr. Polk's Box. However, the Court finds that this fact alone does not render the Government's actions violative of the Fourth Amendment.

Indeed, the fact that the Government counted the money in Mr. Polk's Box can clearly be said to further the goals of ascertaining the owner of Box 5911 (by giving the Government a means of confirming an individual's claim to ownership) and keeping the Government from an allegation of misplacing or stealing that cash (by telling the Government exactly how much money was in Box 5911). Therefore, the Government's apparent break with the Supplemental Instructions plainly had a purpose tethered to the overarching goals of an inventory search. And, it is not clear that counting the cash served any particular investigative purpose.

Further, "failure to follow through with standard procedures does not necessarily render the search unreasonable." *United States v. Mundy*, 621 F.3d 283, 293–94 (3d Cir. 2010) (citing *Whren v. United States*, 517 U.S. 806, 816 (1996) ("[I]t is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures *proves* (or is an operational substitute for) pretext." (emphasis in original)).

Accordingly, given the absence of evidence in this case indicating that the Government's actions were taken in bad faith or *solely* for investigative purposes, and given the clear connection between counting the cash in Mr. Polk's Box and the purposes of an inventory search, the Court holds that the Government did not run afoul of the Fourth Amendment by counting the cash in his Box.

Finally, the Supplemental Instructions indicated that cash found in the boxes was ultimately to be "taken to Loomis, where it [would] be counted." *See supra* Section II.C.3. Therefore, it *may* be the case that the cash was counted in accordance with the policies. However, for the reasons above, the Court need not resolve this issue at this time.

-62-

Likewise, presenting the cash in Mr. Polk's Box to a drug-sniffing dog was an action taken in compliance with the Supplemental Instructions and had a purpose that was plainly connected to the lawful bases for an inventory search, as the Court explained above. *See supra* Section III.A.3.b.ii. Further, even if the Government had a measure of investigatory purpose in presenting the cash to a drug-sniffing dog, that fact alone does not invalidate the Government's actions. *Bertine*, 479 U.S. at 372; *see also Snitko*, 90 F.4th at 1262; *Frank*, 854 F.2d at 1001.

Therefore, the Court holds that the Government's actions relative to Mr. Polk's Box complied with all of the following: the three policies that the Government utilized relative to the search of USPV, the Warrants issued by Magistrate Judge Kim, Supreme Court precedent regarding inventory searches, and the Fourth Amendment to the United States Constitution. As the Court now explains, Mr. Polk's arguments to the contrary do not alter the Court's conclusion.

In contending that the Government's actions relative to his Box did not constitute a valid inventory search, Mr. Polk's primary argument is that it was unnecessary to search the contents of the Box because his personal information was on the lid. (ECF Nos. 1266, 1314, 1338, 1378, 1457). Specifically, he asserts the following:

> This was not a valid inventory search. The government has claimed its reason for doing an inventory was to inform the individual box holders of the seizure so they could make a claim for return of the property. In defendant's case that was unnecessary as his name, address and a photo were on the lid. Thus, there was no legitimate reason to open the box. Claiming it was an inventory search was a brazen pretext to rummage through the boxes for criminal evidence they had no probable cause to believe existed … Furthermore, there was clearly no legitimate need for an inventory as the only person who had keys to the box was the property owner. Thus, no "administrative caretaking function" was necessary.

(ECF No. 1266 at 4). Relatedly, Mr. Polk avers that the "USPV Search Warrant was clear that '[a]gents cannot search the contents of boxes for evidence, but may examine the contents to identify the box owner.'" (ECF No. 1314 at 5).[20]

For two reasons, the Court finds unavailing Mr. Polk's contention that, because his identifying information was on his Box, the Government's search of that Box violated the Fourth Amendment.

First, identifying the owner of Box 5911 (and all other boxes at USPV) was not the only purpose articulated by Magistrate Judge Kim for the inventory search of that Box. Indeed, it is true that Mr. Polk's identifying information was on Box 5911. *See supra* Section II.D. But it is also true, as the Court previously found, that: (1) the "nests of safety deposit boxes and keys" at USPV were subject to forfeiture to the United States pursuant to the Federal Grand Jury Indictment of USPV, *see supra* Section II.A, (2) the valid Warrants issued by Magistrate Judge Kim authorized the seizure of the "[n]ests of safety deposit boxes and keys" at USPV, *see supra* Section II.B, and (3) the Government's lawful possession of the nests of the safe deposit boxes and keys necessitated the Government's possession of the contents of the safe deposit boxes, at least initially. *See supra* Section II.B.1 (according to Agent Zellhart, "[b]y seizing the nests of safety deposit boxes, the [G]overnment will necessarily end up with custody of what is inside those boxes initially."). The Court also reiterates its finding that the Warrants issued by Magistrate Judge Kim authorized an inventory search of the boxes at USPV that was coextensive with

---

[20] The Court has already found that the Government's actions relative to Mr. Polk's Box complied with the Warrants issued by Magistrate Judge Kim. This statement by Mr. Polk, which is devoid of any particular argument in support, does not alter the Court's conclusion.

Supreme Court precedent—meaning that the inventory search was to be conducted for purposes like protecting the agents handling the boxes and insulating the Government from claims of misplaced property or the like. *See supra* Section III.A.2.b; *see also* Section II.B (providing that, in "seizing the nests of safety deposit boxes," agents were to "follow their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents [were to] inspect the contents of the boxes in an effort to identify" the owners of the boxes).

Therefore, given all of the foregoing, the Government necessarily came into possession of the safe deposit boxes at USPV (including their contents), and the Government had every reason to inventory the contents of those boxes to not only identify their owners, but also to protect the agents handling the boxes, and to ensure that the owners of the boxes did not allege that the Government had removed any of the contents of the boxes before (potentially) returning those contents. In short, the mere fact that Mr. Polk's identifying information was on Box 5911 did not eliminate the need for an inventory search of that Box.[21]

Second, the Court reiterates that the Warrants issued by Magistrate Judge Kim affirmatively obligated the agents executing those Warrants to inventory all of contents of all of the safe deposit boxes at USPV. *See supra* Section II.B (directing agents to "follow their written inventory policies to protect their agencies and the contents of the *boxes*. Also in accordance with their written policies, agents [were to] inspect the contents of the *boxes* in an effort to identify" the

---

[21] As further support for this conclusion, the Court notes that Agent Zellhart's affidavit, which was incorporated into the Warrants by reference, explicitly contemplated inventorying the contents of the boxes *and also* examining the boxes to look for identifying information. *See supra* Section II.B.1.

owners of the boxes") (emphasis added). And Mr. Polk has not referred the Court to any provision within the Warrants indicating that, if a box contained identifying information, the agents were free to refrain from inventorying that box. (ECF Nos. 1266, 1314, 1338, 1378, 1457). All of this is critical because the Supreme Court has held that inventory "policies of opening all containers or of opening no containers are unquestionably permissible[.]" *Florida v. Wells*, 495 U.S. 1, 4 (1990). Therefore, requiring the Government to have refrained from opening Mr. Polk's safe deposit box and inventorying its contents because his identifying information was present thereon would be tantamount to requiring the Government to violate its neutral policies, the Warrants issued by Magistrate Judge Kim, and potentially sidestep the type of formulaic policies that the Supreme Court has held are constitutional under the Fourth Amendment.

Accordingly, the Court deems Mr. Polk's arguments on this score unavailing and holds that the Government's actions in inventorying his box at USPV (Box 5911) complied with all of the following: the three policies that the FBI utilized relative to the search of USPV, the Warrants issued by Magistrate Judge Kim, Supreme Court precedent, and therefore, the Fourth Amendment.[22] *United States v. Bedford*, 519 F.2d 650, 657 (3d Cir. 1975) ("Since the warrant was

---

[22] The Court also notes that Mr. Polk refers the Court to the United States Court of Appeals for the Tenth Circuit's decision in *United States v. Haro-Salcedo*, 107 F.3d 769 (10th Cir. 1997). (ECF No. 1266 at 3). In that case, the Tenth Circuit found that a search did not qualify as an inventory search where, among other things, the investigating officer "stated that he was not familiar with [the relevant] inventory policy and could not describe the usual extent of an inventory search conducted in accordance with that policy." *Haro-Salcedo*, 107 F.3d at 773. Conversely, here, the Court has found that the agents inventorying Mr. Polk's Box (at least largely) complied with the three policies that the FBI utilized relative to the search of USPV. Therefore, for this reason and the others set forth in the text above, this Court finds *Haro-Salcedo* distinguishable from the case currently before this Court.

validly executed, the search which followed was also valid[.]"); *United States v. Hall*, 505 F.2d 961 (3d Cir. 1974).[23]

### C. The Court Proceeds With the Understanding That All of the Government's Subsequent Actions Relative to Mr. Polk and His Property Were Appropriate

As the Court noted earlier, Mr. Polk also seeks the suppression of items discovered by the Government at his home and in his hotel room in July 2021 (ECF No. 1266 at 2). However, Mr. Polk seeks to suppress that evidence on the ground that it "derived from the illegal search and seizure" of his safe deposit box at USPV. (*Id.* at 4). Indeed, as counsel for Mr. Polk stated during the Suppression Hearing in this matter, if the initial inventory search of Mr. Polk's Box at USPV "is found to be bad, the other search warrants would be classic fruit of the poisonous tree." (ECF No. 1338 at 17:3–22). Therefore, because it appears to the Court that the primary (and perhaps the only) basis for Mr. Polk's challenge to the Government's subsequent actions relative to him and his property is his contention that the Government's actions relative to his Box during its search of USPV were unlawful, and because the Court has deemed that challenge unavailing, the Court

---

[23] Although the Court need not and does not definitively reach a holding regarding the good faith exception to the exclusionary rule, it does note that, "'when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale [of the exclusionary rule] loses much of its force, and exclusion cannot pay its way.'" *United States v. Franz*, 772 F.3d 134, 145 (2014) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)). In light of these principles, even if Magistrate Judge Kim improperly authorized an inventory search of the boxes at USPV in issuing the Warrants or the Warrants were otherwise invalid, the Court would be highly inclined to find that the good faith exception nonetheless applies relative to the inventory search of Mr. Polk's Box when the Court considers all of the evidence of record and the arguments before it. Indeed, in this case, the Warrants that the agents possessed authorized an inventory of all boxes at USPV that was to be conducted in accordance with the Government's "written inventory policies[,]" and the agents complied with those policies (and thus the Warrants) in all relevant ways in inventorying Mr. Polk's Box. *See supra* Section III.B. Accordingly, even if the Warrants in this case were invalid, the Court would likely find that the agents executing them nonetheless acted with an objectively "reasonable good-faith belief that their conduct [was] lawful." *Franz*, 772 F.3d at 145.

proceeds with the understanding that all of the Government's subsequent actions relative to Mr. Polk and his property were lawful. In other words, given all of the foregoing, the Court proceeds with the understanding that all of the evidence the Government seeks to admit against Mr. Polk at trial was lawfully obtained. Accordingly, the Court will deny Mr. Polk's Motion in its entirety.

## IV.    Conclusion

In closing, the Court briefly reiterates several of its findings. In this matter, a Federal Grand Jury concluded that there was probable cause to believe that both USPV and its business property were closely connected with crimes such as money laundering and drug trafficking. A federal magistrate judge then issued Warrants authorizing law enforcement to search USPV and seize certain of its business property, which necessitated law enforcement coming into possession of the contents of all of the safe deposit boxes at USPV (at least initially). Therefore, that federal magistrate judge authorized an inventory search of the contents of the safe deposit boxes that was to be coextensive with Supreme Court precedent.

In executing those Warrants, the Government could have potentially adhered to a macro policy and simply given its agents a fair measure of discretion in how to inventory the contents of those boxes. Instead, the Government issued a micro policy that directed the agents executing the Warrants to perform an inventory search on all boxes at USPV and carefully regulated the scope of that search. Relatedly, the micro policy that the Government promulgated was in step with the macro policy, the Warrants issued by the magistrate judge, and Supreme Court precedent. Finally, the Government largely adhered to its policies in inventorying Mr. Polk's Box

in particular, and it clearly acted in a manner that was consistent with the purposes of an inventory search in its actions relative to that Box.

Given all of the foregoing, and having considered all of the evidence in this matter, the Court finds that the Government appropriately promulgated and followed standardized criteria that enabled law enforcement to complete a significant undertaking in a lawful manner, including inventorying Mr. Polk's Box. Indeed, the Court now explicitly sets forth what it previously held implicitly—the policies that the Government utilized relative to USPV constituted "reasonable [law enforcement] regulations relating to inventory procedures [that were] administered in good faith [and thus] satisfy the Fourth Amendment," regardless of whether this Court might "as a matter of hindsight be able to devise equally reasonable rules[.]" *Colorado v. Bertine,* 479 U.S. 367, 374 (1987).

Therefore, for all of the foregoing reasons, and because: (1) the Court deems the Government's actions relative to Mr. Polk's Box reasonable under the Fourth Amendment and (2) the Court thus proceeds with the understanding that the Government's subsequent actions relative to Mr. Polk and his property likewise complied with the law, the Court denies Mr. Polk's Motion to Suppress. (ECF No. 1266).

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Case No. 3:21-cr-16** |
| | ) | |
| v. | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **DERRICK POLK,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this ___3rd___ day of July, 2024, upon consideration of Defendant Derrick Polk's Motion to Suppress Evidence (ECF No. 1266), the arguments advanced at the Suppression Hearing before this Court (ECF No. 1338), all of Defendant and the Government's briefing in this matter, (ECF Nos. 1300, 1314, 1367, 1378, 1457, 1496), as well as the record evidence before the Court, (*see* ECF Nos. 1365, 1368), and for the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Evidence (ECF No. 1266) is **DENIED**.

BY THE COURT

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
              Sheet 1

# UNITED STATES DISTRICT COURT

Western District of Pennsylvania

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| DERRICK POLK | ) | Case Number:  3:21-cr-00016-MJH-25 |
| | ) | USM Number:  55512-112 |
| | ) | Amy B Jones, Stanton D. Levenson |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)   1 and 3 of the Superseding Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. 846 | Conspiracy to distribute and possess with intent to distribute | 4/30/2019 | 1s |
| | 1 kilogram or more of heroin, 5 kilograms or more of cocaine | | |
| | 280 grams or more of cocaine base, in the form commonly | | |

The defendant is sentenced as provided in pages 2 through ___9___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is  ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/24/2025
Date of Imposition of Judgment

*[signature]*
Signature of Judge

Marilyn J. Horan, United States District Judge
Name and Title of Judge

9/24/2025
Date

Appx73

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 1A

DEFENDANT:  DERRICK POLK
CASE NUMBER:  3:21-cr-00016-MJH-25

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| | known as crack, 400 grams or more of fentanyl, 50 grams or more of methamphetamine, and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine. | | |
| 21 U.S.C. 841(a)(1) and 841(b)(1)(A)(viii) | Distribution and possession with intent to distribute 50 grams or more of methamphetamine, and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine. | 4/14/2021 | 3s |

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page  3  of  9

DEFENDANT:   DERRICK POLK
CASE NUMBER:   3:21-cr-00016-MJH-25

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
120 months at each of Counts 1 and 3 to be served concurrently for a total term of 120 months.

☑ The court makes the following recommendations to the Bureau of Prisons:
The defendant be assessed for his medical needs for appropriate placement to properly care for his medical conditions.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

Appx75

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page   4   of   9

DEFENDANT:   DERRICK POLK
CASE NUMBER:   3:21-cr-00016-MJH-25

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

 5 years at each of counts 1 and 3 to be served concurrently for a total term of 5 years.

# MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from
     imprisonment and at least two periodic drug tests thereafter, as determined by the court.
         ☐ The above drug testing condition is suspended, based on the court's determination that you
            pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of
         restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as
         directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
         reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached
page.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3A — Supervised Release

| | Judgment—Page | 5 | of | 9 |

DEFENDANT:  DERRICK POLK
CASE NUMBER:  3:21-cr-00016-MJH-25

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____        Date  _____

Appx77

Judgment—Page __6__ of __9__

DEFENDANT:  DERRICK POLK
CASE NUMBER:  3:21-cr-00016-MJH-25

# ADDITIONAL SUPERVISED RELEASE TERMS

1. You must undergo a substance abuse evaluation and follow the recommendations of that evaluation, including any recommendation that you participate in an inpatient and/or outpatient substance abuse treatment program. You must follow the rules and regulations of the treatment program and remain in treatment until satisfactorily discharged from the treatment program by the treatment provider and your discharge from the treatment program is approved by the United States Probation Office. The probation officer will supervise your participation in any recommended treatment program, including, among other things, determining the provider, location, modality, duration, and intensity of the treatment program. You must contribute to the costs of services in an amount determined by the Probation Office and approved by the Court. These costs shall not exceed the actual cost of the service and will be based upon your ability to pay. The probation office may provide a copy of the presentence investigation report to the substance abuse evaluator and substance abuse treatment provider, if so requested.

2. You must not use or possess any controlled substances without a valid prescription. If you do have a valid prescription, you must disclose the prescription information to the probation officer and follow the instructions on the prescription.
3. You must submit to substance abuse testing to determine if you have used a prohibited substance. You must not attempt to obstruct or tamper with the testing methods. You must contribute to the costs of services in an amount determined by the Probation Office and approved by the Court. These costs shall not exceed the actual cost of the service and will be based upon your ability to pay.

4. You must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption, except with the prior approval of the probation officer.

5. You must not go to or remain at any place where you know controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.

6. You must submit your person; property; house; residence; vehicle; papers; computer devices, other electronic communications, network or cloud storage, data storage devices or media; or office, to a search conducted by a United States probation officer. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

7. You must permit confiscation and/ or disposal of any material considered to be contraband or any other item which may be deemed to have evidentiary value of violations of supervision.

8. If the judgment imposes a financial penalty, you must pay the financial penalty in accordance with the Schedule of Payments sheet of this judgment. You must also notify the court of any changes in economic circumstances that might affect the ability to pay this financial penalty.

The defendant must cooperate in the collection of DNA as directed by the probation officer.

The defendant must pay to the United States a special assessment of $200, which is to be paid forthwith to the Clerk of the U.S. District Court.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 5 — Criminal Monetary Penalties

Judgment — Page   7   of   9

DEFENDANT: DERRICK POLK
CASE NUMBER: 3:21-cr-00016-MJH-25

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ 5,410.00 | $ | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | | |
|---|---|---|---|---|
| **TOTALS** | $ | 0.00 | $ | 0.00 |

☐  Restitution amount ordered pursuant to plea agreement   $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☒  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☒  the interest requirement is waived for the   ☒  fine   ☐  restitution.

    ☐  the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Appx79

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page  8  of  9

DEFENDANT:  DERRICK POLK
CASE NUMBER:  3:21-cr-00016-MJH-25

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☐  Lump sum payment of $ _____ due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑  Special instructions regarding the payment of criminal monetary penalties:
    see page 9

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    See page 9

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

DEFENDANT:  DERRICK POLK

CASE NUMBER:  3:21-cr-00016-MJH-25

# ADDITIONAL FORFEITED PROPERTY

Schedule of Payments (F)

The defendant must pay to the United States a special assessment of $200, which is to be paid forthwith to the Clerk of the U.S. District Court. The Defendant shall pay a fine in the amount of $5,410 to the Clerk of the U.S. District Court, Attention Finance Department, 700 Grant Street, Suite 3110, Pittsburgh, PA 15219. The defendant shall make payments to satisfy the criminal monetary penalty in the following manner: (a) monthly installments of $100 or 5% of the defendant's gross monthly income, whichever is greater; (b) the first payment shall be made within 30 days of the following: the defendant's discharge from incarceration, and continue until the criminal monetary penalty is paid in full; and (c) the defendant shall be responsible for providing proof of payment to the probation office as directed.

The Defendant shall forfeit the following property to the United States:

Breitling Super Ocean Watch, serial number 7089691
Breitling Super Ocean Watch, serial number 5077160
Rolex Cosmograph Daytona 40 watch
Rolex Yacht-Master Watch, serial number 646W59W5
14k yellow gold diamond line chain and cross pendant
14k gold men's bracelet with 6.67 ct brilliant diamonds in circular clusters
14k white gold men's rolling link bracelet, weight 25 ct round brilliant diamonds
Rolex Date Just Watch, serial number 875D7669
Breitling for Bentley Watch, serial number 209867
Rolex Presidential Watch, serial number D53P7350
$399,000 in U.S. currency
Taurus pistol, Model G3C, 9mm, serial number

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.  3:21-cr-16 |
| v. | ) | |
| | ) | |
| DERRICK POLK | ) | |

**PRELIMINARY ORDER OF CRIMINAL FORFEITURE
AGAINST DERRICK POLK**

AND NOW, this 25th of September 2025, it is hereby ORDERED that the following Preliminary

Order of Criminal Forfeiture is hereby entered.


1. All right, title and interest of Derrick Polk in the following property, further identified by asset

identification numbers 21-FBI-002940, 21-USP-002258, 21-USP-001681, 21-USP-001682, 21-USP-

002249, 21-USP-002250, 21-USP-002251, 21-USP-002252, 21-USP-002253, 21-USP-002254, 21-USP-

002255, 21-USP-002256, and 21-USP-002258, are forfeited to the United States for disposition in

accordance with federal law pursuant to 18 U.S.C. § 982 and 21 U.S.C. §§ 853(a)(1), (a)(2), and 853(p):

   a.  Breitling Super Ocean Watch, serial number 7089691

   b.  Breitling Super Ocean Watch, serial number 5077160

   c.  Rolex Cosmograph Daytona 40 watch

   d.  Rolex Yacht-Master Watch, serial number 646W59W5

   e.  One 14k yellow gold diamond line chain and cross pendant

   f.  One 14k gold men's bracelet with 6.67 ct brilliant diamonds in circular clusters

   g.  One 14k white gold men's rolling link bracelet, weight 25 ct round brilliant diamonds

   h.  Rolex Date Just Watch, serial number 875D7669

   i.  Breitling for Bentley Watch, serial number 209867

   j.  Rolex Presidential Watch, serial number D53P7350

   k.  $399,000 in U.S. currency.

   l. Taurus pistol, Model G3C, 9mm, serial number ABL193060

Appx82

2. The following property, further described by asset identification numbers 21-USP-002251 and 21-USP-002252, is no longer being pursued for forfeiture by the United States:

a. One 14k yellow gold mesh chain and two cross pendants, one accented with baguette and princess cut diamonds;

b. One 30" stainless steel link chain; and

c. One14k white gold men's line bracelet with 4.20 brilliant diamonds.

3. This Order of Forfeiture against Derrick Polk is made part of the criminal judgment against him and incorporated into his sentence pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

4. The Court will adjudicate all third-party claims.

　s/*Marilyn J. Horan*
Marilyn J. Horan
United States District Judge

## CERTIFICATE OF SERVICE

I certify that on December 31, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Eli Nachmany*